3 P.M., INC., Plaintiff,

v.

BASIC FOUR CORPORATION, Sorbus,
Inc., and Management Assistance,
Inc., Defendants.

Civ. A. No. 79–74416.

United States District Court,
E.D. Mich., S.D.

Aug. 2, 1984.

Paul Monicatti, Troy, Mich., William I. Rutherford, St. Louis, Mo., for plaintiff.

Carl H. von Ende, Birmingham, Mich., Gerald Walpin, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

Plaintiff 3 P.M., Inc. ("3PM") brought this action against defendants Basic Four Corporation ("B/4"), Sorbus, Inc. ("Sorbus"), and Management Assistance, Inc. ("MAI"), alleging four violations of the Sherman and Clayton Acts [1] and bringing pendent state claims of fraud and breach of contract. Now before the Court are defendants' motion for summary judgment as to all counts of plaintiff's complaint, and plaintiff's cross-motion for summary judgment as to Counts I and II of its complaint. For the following reasons, the Court hereby grants defendants' motion in full and denies plaintiff's cross-motion.

The following facts are undisputed. 3PM sells, installs, and services small business computer systems in the Detroit metropolitan area. MAI is a holding company which owns all of the stock in both B/4 and Sorbus.[2] Sorbus installs and maintains computer systems, including those manufactured by B/4. B/4 designs and manufactures computer systems. Its systems consist of a Central Processing Unit along with one or more "peripheral" items, such as video display terminals and printers, which are sold as a unitary system under the B/4 trademark. Some of the peripherals are not manufactured by B/4, but are rather purchased by B/4 from other manufacturers and then resold as part of the B/4 system. B/4's practice was to charge a "foreign device fee" for each such peripheral, allegedly for the cost of adapting the peripheral for use in the B/4 system.

B/4 markets its products both through company-owned branch sales offices and through independent dealers. B/4 assigns each independent dealer the exclusive right to sell B/4 systems within a designated territory, subject to provisions included in a dealer agreement.

On March 25, 1977, B/4 and 3PM executed a dealer agreement under which 3PM became the B/4 dealer in the Detroit metropolitan area. The agreement included the following provisions:

2. (C) Whenever the Dealer has a potential order for installation of Products outside the Territory, the Dealer shall register with the Seller in writing the name of the potential customer and shall advise the Seller, to the extent known, of the terms of any such prospective sale . . .

\* \* \* \* \* \*

(D) Whenever the Seller has a potential order for Products from an existing or potential user of Systems involving the installation of Products within and outside the Territory and such sale is consummated between the customer and a party unaffiliated with Dealer, the Seller shall notify the Dealer . . .

\* \* \* \* \* \*

6. (A) This agreement may be cancelled:

\* \* \* \* \* \*

(2) By the Seller:

\* \* \* \* \* \*

(d) At its discretion, if the Dealer fails to meet the Purchase Quota established in Schedule D hereto for any of the successive six (6) month periods commencing with the "Purchase Quota Commencement Date" specified in Schedule D hereto, the cancellation to be effective thirty (30) days after delivery of notice to the Dealer as to its failure to meet the Purchase Quota, provided that such notice is

---

1. 15 U.S.C. § 1 *et seq.;* 15 U.S.C. § 12 *et seq.*

2. In October, 1980, B/4 and Sorbus merged into and became divisions of MAI. However, the

defendants were separate corporations when this suit was instituted, and at all times relevant to the allegations in plaintiff's complaint.

delivered within sixty (60) days after the end of any such six (6) month period . . .

\* \* \* \* \* \*

10. (A) The Dealer shall promote the sale and distribution of Products in the Territory and provide adequate support, which efforts shall include the following:

\* \* \* \* \* \*

(2) To provide an adequate size, caliber and trained sales force to promote and maximize the sale of the Products. . . .

\* \* \* \* \* \*

16. . . . the Dealer will, and will use its best efforts to require purchasers from it of Products to, make arrangements with Sorbus for the installation and maintenance of Products during at least the two (2) year period commencing with delivery to a user . . .

\* \* \* \* \* \*

23. The Dealer shall not purchase from any source other than the Seller any item manufactured or sold by the Seller except for the purchase of any Product installed in the Territory.

29. (A) The entire Agreement between the Seller and Dealer covering the Products is set forth herein and any amendment or modification shall be in writing and shall be executed by duly authorized representatives in the same manner as this Agreement.

Schedule D to the agreement included the following quota provisions:

| Quota Year | First Six Month Purchase Quota Period | Second Six Month Purchase Quota Period |
|---|---|---|
| Year 1 | $210,000 | $280,000 |
| Year 2 | $437,500 | $437,500 |
| Year 3 | $647,500 | $647,500 |

\* \* \*

3. . . . Eligibility of accepted orders for (quota) credit as to products sold by Dealer and installed outside the Territory shall be at Seller's sole discretion.

The dealer agreement was executed only after rather protracted negotiations. The draft of the agreement initially sent to 3PM contained ¶ 6(A)(2)(d) as set forth above, and quota requirements which were higher than those eventually included in the agreement. After reviewing the proposed draft, Robert Yanover and George Squillace, 3PM's president and vice-president, met with B/4 officials. Yanover specifically requested that ¶ 6(A)(2)(d) be deleted from the agreement, and that the quota requirements be "substantially reduced". Yanover Deposition at 338–9. B/4 officials agreed to reduce the quota figures to those set forth above. B/4 officials further stated that B/4 planned to have long-term relationships with its dealers, and that the quotas contained in the agreement were attainable.

However, B/4 emphatically refused to delete ¶ 6(A)(2)(d) from the agreement. B/4 also refused to include a provision, requested by Yanover, to the effect that 3PM would not be terminated if it was using its best efforts. Yanover Deposition at 339. Despite B/4's refusal to make these requested changes in the agreement, 3PM executed the dealer agreement and began promoting the sales of B/4 products.

3PM attained its quota for the first six-month period set forth in the agreement, which ended December 31, 1977. However, its sales in the second six-month period declined dramatically. Its total sales for this six-month period were only $63,662.00, a figure which was approximately 23% of the quota requirement. During the last three months of this period, moreover, 3PM did not employ a single full-time salesperson.

B/4 was aware of this dramatic decrease in sales, and it warned 3PM that it was required to meet the quota requirements in the agreement. On July 28, 1978, within the 60-day period required by ¶ 6(A)(2)(d) of the agreement, B/4 notified 3PM that it was terminating 3PM's dealership because of 3PM's failure to achieve the quota requirements. The termination led to 3PM's institution of this action.

Three events which occurred during 3PM's tenure as a B/4 dealer are relevant to certain portions of 3PM's complaint. The first involved 3PM's dealings with the R.L. Polk Company, a firm which had its headquarters in 3PM's Detroit sales territory. 3PM learned that Polk was considering a purchase of five computer systems, for

use in its regional offices. 3PM sought to register Polk as a "national account"[3] with B/4. B/4 refused this request, and instead permitted 3PM to compete with its Nashville dealer for the Polk sale. B/4 arranged a demonstration which was presented to Polk, but no sale ever resulted.

The second involved a sale by B/4's Atlanta branch to RCA Distributing Corp. of a computer system to be installed in the Detroit territory. 3PM assisted with the sale and installation of this system, and was initially promised 50% of the sale price as credit toward its quota requirement. However, B/4 ultimately awarded 3PM only 40% of the price as quota credit.

Finally, 3PM requested B/4 to permit it to sell to customers in Florida, well outside its sales territory. B/4 refused this request.

### A. COUNTS I AND II

In Count I of its complaint, 3PM alleges that the inclusion of ¶ 16 in the dealer agreement violated the Sherman and Clayton Acts. 3PM alleges that defendants were able to include this paragraph in the agreement as a result of their economic power in the market for interactive minicomputers. 3PM alleges that because of this paragraph, it was unable to compete with defendants in the market for computer servicing and maintenance, and that a not insubstantial amount of interstate commerce was restrained as a result.

In Count II, 3PM alleges that ¶ 23 of the dealer agreement was a similar violation. 3PM alleges that this paragraph was included because of defendants' economic power in the market for interactive mini-

computers. It alleges that because of ¶ 23, it was prevented from buying peripherals from defendants' competitors, at prices far less than those charged by defendants. It alleges that a not insubstantial amount of interstate commerce was similarly restrained by this provision of the agreement.

As an initial matter, the parties disagree as to what type of antitrust violations are alleged in these counts. Defendants contend that Count I alleges merely an ancillary restraint, while Count II alleges an exclusive dealing arrangement. 3PM contends that both Counts allege tying arrangements. The Court will adopt 3PM's characterization of the complaint.[4] Even when the complaint is read to allege tying arrangements, however, the Court finds that defendants are entitled to judgment on Counts I and II as a matter of law.

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railroad Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).[5] Such an agreement can be found to violate § 1 of the Sherman Act, 15 U.S.C. § 1, and/or § 3 of the Clayton Act, 15 U.S.C. § 14. The Clayton Act can be violated only if the tying arrangement involves two distinct products; in contrast, the Sherman Act can be violated if the tying arrangement involves either products or services.

[3] Under either act,[6] a tying arrangement constitutes a *per se* antitrust violation

---

**3.** This was pursuant to ¶ 2(C) and (D) of the dealer agreement, which regulated the sales of B/4 products to customers outside of a dealer's exclusive territory.

**4.** Fed.R.Civ.P. 8(a) requires only that a plaintiff set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." As discussed *infra,* 3PM's complaint adequately alleges the elements of a tying arrangement.

**5.** Thus Count II can be regarded as alleging a tying arrangement, even though ¶ 23 of the deal-

er agreement does not *require* the purchase of the peripheral units which defendants offered for sale. This provision of the agreement forbade 3PM to purchase such units from any of defendants' competitors.

**6.** Although the Sherman and Clayton Acts were earlier considered to set forth differing standards in this regard, it is now well accepted that the same standards apply under both Acts. *See, e.g. Moore v. James H. Matthews & Co.,* 550 F.2d 1207 (9th Cir.1977).

if three elements are established. First, there must be two separate products or services, with the purchase of one (the "tying product") conditioned upon the purchase of the other (the "tied product"). Second, the seller must possess sufficient economic power in the market for the tying product so that competition in the market for the tied product is appreciably restrained. Finally, a "not insubstantial" amount of commerce in the market for the tied product must be affected. *See In Re Data General Corp. Antitrust Litigation,* 490 F.Supp. 1089, 1100 (N.D.Cal.1980).

Defendants contend that none of these elements are present in the case at bar, as a matter of law. 3PM, on the other hand, contends that all three have been established as a matter of law. The Court finds that 3PM has produced no evidence that defendants possessed economic power in the market for the tying product, and that these counts must therefore be dismissed.

The requirement that the seller possess sufficient economic power was most recently explained by the Supreme Court in *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (*Fortner I*) and *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*). Plaintiff in *Fortner* brought an action under the Sherman Act, alleging that in order to obtain loans in excess of $2,000,000 from defendant, to be used to purchase and develop certain land, it had been required to purchase prefabricated homes manufactured by defendant to be erected on this land. It alleged that the prefabricated homes were sold at unreasonably high prices. On defendant's motion, the district court granted summary judgment in favor of defendant. It found that defendant did not have sufficient economic power in the market for credit, and that the agreements involved did not restrain a substantial amount of commerce in the market for prefabricated homes.

In *Fortner I,* the Court reversed the district court's grant of summary judgment. The Court first found that the agreements at issue *did* restrain a substantial amount of commerce in the market for

the tied product, holding that the relevant figure was the *total* volume of sales tied by the policy being challenged, not merely that portion of the total accounted for by the plaintiff. The Court then found that there were factual disputes as to whether defendant possessed sufficient economic power in the market for the tying product, and that the grant of summary judgment was therefore improper.

The Court defined market power as "the ability of a single seller to raise price and restrict output" and described the necessary inquiry as follows:

[T]he proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.

394 U.S. at 503–4, 89 S.Ct. at 1258–59. The Court noted that plaintiff had produced evidence to the effect that defendant's competitors sold similar prefabricated homes at a price which was $400 less than defendant's price, and that credit on defendant's advantageous terms was not available from any other source at the time the loans were executed. The Court found that this evidence could tend to prove that defendant had "unique economic advantages over (its) competitors", explaining that defendant "may well have had a substantial competitive advantage in providing this type of financing because of economies resulting from the nationwide character of its operations." *Id.* at 505–6, 89 S.Ct. at 1260. The Court held that these disputed facts were sufficient to preclude a grant of summary judgment.

On remand, the district court conducted a bench trial and found that the defendant's acts did indeed violate § 1 of the Sherman Act. The district court concluded that defendant did possess the requisite economic power in the market for the tying product.

This ruling was also appealed; in *Fortner II,* a unanimous Court reversed the judgment which had been entered in favor of plaintiff. The Court first reviewed the evidence which plaintiff had introduced to establish that defendant possessed economic power in the market for credit. Plaintiff

had established that defendant had entered into similar tying arrangements with many other customers. Plaintiff had further established that defendant charged a noncompetitive price for its prefabricated homes. Finally, plaintiff had established that the terms of defendant's loan were unique[7] and that a loan on similar terms could not be acquired from any other source at the time in question.

The Court held that this evidence was insufficient as a matter of law to support a finding that defendant possessed economic power in the market for credit. The Court found that economic power could not be inferred from the fact that plaintiff and others had accepted the alleged tie-in and paid a noncompetitive price for the tied product, explaining:

> Fortner contends that acceptance of the package by a significant number of customers is itself sufficient to prove the seller's economic power. But this approach depends on the absence of other explanations for the willingness of buyers to purchase the package.

429 U.S. at 618, n. 10, 97 S.Ct. at 867, n. 10.

The Court further held that the requisite uniqueness was not established by plaintiff's showing that defendant's competitors *did not* offer credit on similar terms, but rather that plaintiff was required to show that defendant's competitors *could not* offer credit on such terms. The Court stated:

> [T]he question is whether the seller has some advantage not shared by his competitors in the market for the tying product.
>
> \* \* \* \* \* \*
>
> Without any evidence that [defendant] had some cost advantage over its competitors—or could offer a form of financing that was significantly differentiated from that which other lenders could offer if they so elected—the unique character of its financing does not support the conclusion that [defendant] had the kind of

economic power which Fortner had the burden of proving in order to prevail in this litigation.

*Id.* at 620–22, 97 S.Ct. at 868–69.

After *Fortner I* and *Fortner II*, economic power in the market for the tying product can be established in one of three ways. First, it may be shown that the defendant occupies a dominant position in the market for the tying product. Second, it may be shown that the tying product is "unique", as that term has been further defined in *Fortner II*. Finally, it may be shown that a number of the defendant's customers have accepted the tie-in, that there is no explanation other than the defendant's economic power for their willingness to do so, and that the defendant possesses the power to raise prices. *See e.g., In Re Data General Corp. Antitrust Litigation, supra,* 490 F.Supp. at 1111–2.

In both Count I and Count II of its complaint, 3PM alleges that the tying product in this action is the B/4 series of interactive mini-computers. *See* complaint at ¶¶ 11, 17. Accordingly, the Court must determine whether 3PM has produced any evidence on these motions which tends to prove under any of these three theories that defendants possessed economic power in the market for interactive mini-computers.

### 1. *Dominant Market Position*

In its initial brief, 3PM conceded that it does not even know what defendants' share of this market is, and that it was therefore not attempting to show that defendants occupied a dominant position in this market. In any event, defendants have produced evidence that their share of the Detroit area market for interactive mini-computers was less than 1% at the times relevant to this action. 3PM's only response on this issue is an affidavit from John H. Tipton, in which he asserts that B/4's share of the California market for small business computers was 10% in 1977. The California market, however, is irrelevant to the claims

---

**7.** The terms of this loan were unique in three respects. First, the loan covered 100% of the cost of acquiring and developing certain real estate. Second, the loan was not guaranteed by any of the shareholders or officers of the plaintiff corporation. Finally, the loan was offered at an unusually low rate of interest. *Fortner II,* 429 U.S. at 616, 97 S.Ct. at 865.

raised in 3PM's complaint.[8] The Court finds that no material disputes of fact remain in this regard, and that defendants did not have a dominant position in the Detroit market as a matter of law.

### 2. Uniqueness of Tying Product

3PM has attempted to establish that defendants possessed economic power in the market for the tying product primarily by asserting that the B/4 products were unique at the time in question. For example, 3PM asserts that B/4's software was "exceptionally easy to program." Plaintiff's initial memorandum at 13. 3PM has relied heavily on defendants' promotional literature as "evidence" of this uniqueness. The Court has serious doubts that defendants' sales literature can properly be utilized to create a dispute of fact. Even assuming that this proposition has been established, however—i.e. that B/4's equipment had capabilities which were unmatched by the equipment of any of defendants' competitors—this does not establish that the B/4 units were "unique" as that term was defined in *Fortner II*.

■ As discussed above, under *Fortner II*, plaintiff's burden is not satisfied by showing that none of defendants' competitors offered a similar product at the time in question. Indeed, it was undisputed in *Fortner II* that none of the defendant's competitors offered credit on similarly advantageous terms. The Court held that this showing was insufficient to establish economic power.

3PM's burden, rather, is to prove that none of defendants' competitors *could have* produced products which would perform the functions performed by defendants' products, because defendants possessed some advantage not shared by their competitors.[9] 3PM has not even attempted to make such a showing. In fact, the only evidence on this record which is relevant to this issue suggests that defendants' competitors *could have* produced similar products, and had actually begun to produce such products subsequently. Robert Yanover, 3PM's president, testified at his deposition that 3PM now sells equipment manufactured by one of B/4's competitors which is the "functional equivalent" of the B/4 equipment which 3PM earlier sold. Yanover Deposition at 70. In addition, William Bittick, a programer for 3PM, has stated in an affidavit that "other computer manufacturers are now offering new business basic programming languages patterned after the Basic/Four Business Basic Language."[10] 3PM has produced no evidence which tends to show that none of defend-

---

**8.** *See* complaint at ¶¶ 7, 9, 10, and 12:

Plaintiff has been for many years in the business of servicing and marketing computers for various businesses within the Detroit metropolitan area.

\* \* \* \* \* \*

Basic/Four Corporation agreed that plaintiff would become the distributor for Basic/Four computer equipment in the Detroit market area.

\* \* \* \* \* \*

Sorbus' ability to install and maintain Basic/Four equipment in the Detroit area was inadequate in a number of respects ...

\* \* \* \* \* \*

The purpose and effect of the requirement for the use of Sorbus by plaintiff was financially to benefit Sorbus and its parent company MAI and to establish a customer base for Sorbus, Inc. in the Detroit area to the detriment of plaintiff.

**9.** *See* II E. Kintner, *Federal Antitrust Law* at 238 (1980):

Under the rule of *Fortner II*, inquiry into the uniqueness of a given product must focus on whether the seller in the tying market has the ability either to charge a price or impose a burden that he would not be able to extract in a competitive market. Without a showing of either (1) some cost advantage on the part of the seller, or (2) a characteristic of the tying item that sufficiently differentiates the product so that no competitor could offer the product if he so chooses, the uniqueness of the product will not support a finding of economic power. Thus, the mere fact that a product is attractive will not establish sufficient economic power. (Footnotes omitted.)

**10.** Bittick asserts that none of these other manufacturers offered such products until 1978, and that the other products were still inferior to those manufactured by defendants at the time of his affidavit. These statements may create a factual dispute as to whether defendants' competitors *did* produce substantially equivalent products. As discussed above, however, this is not the pertinent inquiry. 3PM is required to establish that defendants' competitors *could not* produce equivalent products, and Bittick's statements do not tend to prove this proposition.

ants' competitors could have offered similar products during the period at issue. The Court therefore finds that no material disputes of fact remain in this respect.

In a further attempt to establish that the B/4 units were unique, 3PM asserts that only these units were sold under the B/4 trademark, that some of B/4's software is protected by copyright, and that defendants possess trade secrets which were used in producing the B/4 units. Even if these assertions are accepted as true, however, they are insufficient to establish the economic power which is required by *Fortner II.*

The majority view is that the mere existence of a trademark does not give rise to a presumption that the holder of the trademark possesses economic power in the relevant market. *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658 (2d Cir.1974); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39 (5th Cir.1976); *Northern v. McGraw-Edison Co.*, 542 F.2d 1336 (8th Cir.1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977). A contrary rule has been applied only in the Ninth Circuit, and the application of that rule has been questioned even within that Circuit. *See Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *c.f. Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108 (C.D.Cal.1978).

Similarly, the fact that some of B/4's software is copyrighted does not establish that defendants possessed economic power. *See In Re Data General Corp. Antitrust Litigation, supra*, 490 F.Supp. at 1112 ("[T]he sole fact of the existence of a copyright notice has not been held sufficient to prove economic power"). In arguing to the contrary, 3PM relies upon *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). In *Loew's*, the Court held that each of a number of copyrighted motion pictures was a unique product, and

that the defendants who sold or licensed these films therefore possessed economic power. However, this finding was not based merely upon the fact that each film was copyrighted; rather, the Court found that each of the films "varied in theme, in artistic performance, in stars, in audience appeal, etc.". *Id.* at 48, 83 S.Ct. at 104.[11] Thus the copyrighted nature of the B/4 software, standing alone, similarly fails to establish that the B/4 units were "unique" as that term has been defined in *Fortner II.*

Finally, 3PM's contention that the existence of trade secrets confers economic power upon defendants is completely unsupported by authority. Defendants have presented unrebutted authority to the contrary, and this contention is clearly not well-founded. *In Re Data General Corp. Antitrust Litigation, supra*, 490 F.Supp. at 1113–4 ("[I]t has never been held that trade secrets protection is sufficient to create a presumption of economic power.").

In sum, neither the existence of the B/4 trademark, the copyrighted character of B/4's software, nor the existence of trade secrets relieves 3PM of its burden under *Fortner II* to prove that defendants possessed "some advantage not shared by (their) competitors in the market for the tying product." *Id.*, 429 U.S. at 620, 97 S.Ct. at 868, and that defendants' competitors therefore *could not have* produced a product which was similar to the B/4 unit. The existence of the trademark and the copyright are not irrelevant to 3PM's burden in this regard. For example, 3PM could perhaps carry its burden, or at least create a dispute of fact for the purposes of these motions, by producing evidence which tends to show that because defendants' products were sold under the B/4 trademark, competing products which performed the same functions but were not sold under the B/4 trademark would not be substantially similar products.[12] Similarly, 3PM

---

11. *See Capital Temporaries, Inc. v. Olsten Corp., supra,* 506 F.2d at 663:

> The appellant misreads *Loew's* if he concludes that the mere existence of the copyrighted tying motion pictures was enough to create the tying. The *tied* films were also copyright-

ed ... The tying was created by the attractiveness of some of the films, as contrasted to the inferior quality of the others also required to be purchased in the package.

12. This would require a showing that the B/4 trademark has attained national preeminence,

could perhaps carry its burden, or at least create a dispute of fact, by producing evidence which tends to show that because some of B/4's software was copyrighted, none of defendants' competitors *could have* created substantially similar products. *But see Data Cash Systems, Inc. v. JS & A Group, Inc.,* 480 F.Supp. 1063 (N.D.Ill. 1979), *aff'd,* 628 F.2d 1038 (7th Cir.1980) (copyright notices attached to computer software do not prevent others from developing functionally equivalent programs).

Either showing would tend to prove that defendants' products were "unique" under *Fortner II;* if 3PM had produced *any* evidence along these lines, the resulting factual dispute would preclude a grant of summary judgment. On this record, however, 3PM has produced no evidence whatsoever which would tend to prove these propositions, or which otherwise tends to prove that defendants' units were unique. The Court is therefore constrained to find that defendants' units were not unique, as a matter of law.

### 3. *Customers' Acceptance of Tie-in*

In *Fortner I,* the Court suggested that economic power in the market for the tying product could be established merely by showing that the alleged tie-in had been imposed on a large number of customers. In describing the degree of economic power which must be shown to establish *per se* liability, the Court stated:

> Market power is usually stated to be the ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices. Even a complete monopolist can seldom raise his price without losing some sales; many buyers will cease to buy the product, or buy less, as the price rises. Market power is therefore a source of serious concern for essentially the same reason, regardless of whether the seller has the greatest economic power possible or merely some lesser degree of appreciable

economic power. In both instances, despite the freedom of some or many buyers from the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product. Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.

394 U.S. at 503–4, 89 S.Ct. at 1259.

3PM has relied heavily upon this language, and has stressed the undisputed facts that the tie-in alleged in Count I was accepted by 27 of defendants' 29 dealers, while the tie-in alleged in Count II was accepted by all 29 dealers. 3PM contends that these facts alone establish that defendants possessed economic power in the market for the tying product.

However, after *Fortner II,* it is clear that these facts alone do *not* establish that defendants possessed economic power.[13] In *Fortner II,* the Court explicitly qualified the language quoted above in two respects. First, the Court indicated that even if the alleged tie-in has been accepted by a large number of buyers, this fact does not relieve the plaintiff of its burden to show that the seller possesses economic power in the sense of the power to raise prices. The Court quoted with approval from a commentator's analysis of the above-quoted language from *Fortner I:*

> One important question in interpreting the *Fortner* decision is the meaning of this language. Taken out of context, it might be thought to mean that, just as

---

and is usually attractive as a result. *See Krehl v. Baskin-Robbins Ice Cream Co., supra; see generally* Kintner, *supra,* at 249.

**13.** Indeed, it was undisputed in *Fortner II* that defendant had entered into the alleged tying

arrangements with a large number of its customers. The Court held that this evidence was insufficient as a matter of law to establish that defendant possessed economic power in the market for the tying product.

the "host of tying arrangements" was "compelling evidence" of "great power" in *Northern Pacific,* so the inclusion of tie-in clauses in contracts with "any appreciable number of buyers" establishes market power. But the passage read in context does not warrant this interpretation. For the immediately preceding sentence makes clear that market power in the sense of power over price must still exist. If the price could have been raised but the tie-in was demanded in lieu of the higher price, then—and presumably only then—would the requisite economic power exist.

Dam, *1969 Supreme Court Review* at 25–26, quoted in *Fortner II,* 429 U.S. at 620, n. 13, 97 S.Ct. at 868, n. 13.

Second, as noted above, the Court noted that the buyers' acceptance of the tie-in is indicative of economic power only in the absence of any other explanation for their willingness to accept such an arrangement. *See Fortner II,* 429 U.S. at 618, n. 10, 97 S.Ct. at 867, n. 10.

■ Accordingly, after *Fortner II,* it is not sufficient that 3PM has established that defendants' dealers accepted the alleged tie-ins. 3PM also bears the burden of proving that defendants possessed "power over price", and there must be an absence of evidence that the dealers accepted the alleged tie-ins for other reasons.[14] Because 3PM does not agree that it is required to establish the defendants' power over price, it has not even attempted to do so. *See* reply brief at 20. This renders insufficient as a matter of law 3PM's attempt to establish that defendants possessed economic power in the market for the tying product.[15]

■ In sum, 3PM has raised no disputes of fact which are relevant to a determination of the defendants' share of the relevant market, of the uniqueness *vel non* of the tying product, or of the defendants' economic power in the market for the tying product generally. Accordingly, 3PM has failed as a matter of law to establish that the tying arrangements alleged in Counts I and II of its complaint constitute *per se* violations of the antitrust laws. Counts I and II of its complaint must therefore be dismissed.[16]

---

**14.** *See* 2 J. von Kalinowski, *Antitrust Laws and Trade Regulation* at § 6G.05[2] (1983):

The number of tying arrangements that would constitute some evidence of economic power in the market for the tying product was referred to as *a host* of tying arrangements in *Northern Pacific* and as *any appreciable number* in *Fortner I. Fortner II* makes clear, however, that these vague terms of quantity will only establish proof of economic power provided (1) there is also *evidence* of the seller's power over price and (2) there is no evidence of any other explanation such as price competition for the willingness of the customers to accept the seller's tie-in. (original emphasis.)

**15.** In addition, defendants have produced unrebutted evidence which offers other explanations for the buyers' willingness to accept the tie-ins alleged. *See* defendants' reply brief at 30, n. 19.

**16.** A finding that an alleged tying arrangement is not a *per se* violation usually does not end the court's inquiry, as a plaintiff may also attempt to prove that a tying arrangement violates the rule of reason. *See Fortner I,* 394 U.S. at 500, 89 S.Ct. at 1257. Under this theory, a plaintiff is required to establish the facts peculiar to the business involved, its condition before and after the alleged restraint was applied, the nature and history of the alleged restraint, the reason for adopting the alleged restraint, and its actual or probable effect. *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

3PM's only comments on this issue suffer from the same infirmity which permeates much of its arguments on these motions: a propensity to allege every imaginable form of tying arrangement, coupled with a refusal to indicate clearly what is alleged or what evidence is proffered in support. In this regard, 3PM has consistently contended that the tying arrangements alleged are *per se* illegal, and has made no attempt whatsoever to present any evidence which would establish liability under the rule of reason. In the final paragraph of its reply brief, however, 3PM states:

Plaintiff believes the claims here stated are properly characterized and correctly analyzed, and that these claims may be inexpensively decided without the necessity of submitting to the jury the issue of the unreasonableness of defendants' conduct and without the necessity of presenting market study evidence and expert witness evidence from economists. But should the Court conclude otherwise, it is respectfully requested that plaintiff be given the opportunity to submit such issues and to explore the availability of such evidence, and to present it, if needed.

*Id.* at 41.

Fed.R.Civ.P. 56(e) provides:

## B. COUNTS III AND IV

The allegations set forth in Counts III and IV of 3PM's complaint involve defendants' enforcement of ¶¶ 2(C), 2(D), and 3 of the dealer agreement. ¶ 2(C) of the agreement regulated the pricing of items which 3PM sold to customers not within the territory, and otherwise governed such sales. Conversely, ¶ 2(D) governed the sales of B/4 products within 3PM's territory by other B/4 branches and dealers. Finally, as noted above, ¶ 3, included in Schedule D to the agreement, provided that if 3PM were to sell any B/4 products outside its territory, an award of quota credit for such sales would be "at (B/4's) sole discretion".

3PM alleges the same factual basis for both Count III and Count IV. It alleges that B/4 denied its request to register R.L. Polk Company as a national account, and instead arranged an unsuccessful sales presentation. It alleges that it assisted in the sale and installation of computer equipment for RCA Distributing Corp., as requested by B/4. It alleges that it was promised 50% of the profit on the sale, but was ultimately awarded only 5%. 3PM also complains that it was promised a 50% quota credit but was granted only a 40% credit. Finally, it alleges that it requested of B/4 permission to solicit certain customers in Florida, and that such permission was denied.

### COUNT III

In Count III, 3PM alleges that defendants violated § 1 of the Sherman Act by arbitrarily and unevenly enforcing these provisions of the agreement. It alleges that defendants enforced these provisions in such a manner as to favor company-owned branch offices over independent dealers. More particularly, 3PM alleges that defendants enforced these provisions in this manner so that they could terminate 3PM's dealership under ¶ 6(A)(2)(d) of the

agreement and then replace 3PM with a company-owned branch office.

■■■ Even if 3PM's factual allegations are accepted as true, this conduct clearly did not violate the Sherman Act. It is well settled that a manufacturer does not violate the Sherman Act merely by replacing one distributor with another, or even by taking over a distributorship itself. In *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir.1963), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), plaintiff alleged that it had been terminated as a distributor for the Stroh Brewery Company. It alleged that the defendants, including Stroh, had conspired to cancel plaintiff's distributorship and award it to another of the defendants. All defendants moved to dismiss, and the district court granted their motion. The Court of Appeals affirmed, holding that plaintiff's allegations failed to state a claim under the Sherman Act. The Court noted:

> The present case does not involve price fixing. Nor does it involve an attempt to create a monopoly. The Stroh Brewery Company had one distributor in the territory under consideration before it terminated the plaintiff's franchise. It continued to have only one distributor thereafter.

318 F.2d at 287.

*Ace Beer* was applied in a case very similar to the case at bar in *B & B Oil & Chemical Co. v. Franklin Oil Corp.*, 293 F.Supp. 1313 (E.D.Mich.1968). Plaintiff had been defendant's exclusive distributor in a specified territory. It alleged that two of its salesmen and defendant had conspired to take over one of plaintiff's most profitable accounts, and that it was ultimately terminated as a distributor. Plaintiff brought an action under § 1 of the Sherman Act as a result of the termination.

The court granted summary judgment in favor of defendant, finding that plaintiff

---

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Defendants have here moved for summary judgment on all counts of 3PM's complaint. 3PM cannot avoid a grant of summary judgment merely by requesting an "opportunity ... to explore the availability of ... evidence", and the Court therefore must deny 3PM the "opportunity" requested.

had failed to state a claim under the Sherman Act. The court stated:

> It is obvious at this point that what (defendant) did here was to eliminate the dealership of a distributor who enjoyed a lucrative account and take over the account itself.
>
> \* \* \* \* \* \*
>
> It is just at this point that plaintiff's case fails, even conceding the inequities charged, since the result of the defendants' activities is not destructive of competition but merely the substitution of one supply source for another, whether it be the manufacturer himself or another distributor.

293 F.Supp. at 1316–7; *accord, Aaron E. Levine & Co. Inc. v. Calkraft Paper Co.,* 429 F.Supp. 1039 (E.D.Mich.1976).

■ It should be noted that 3PM's factual allegations in the case at bar are inconsistent with its claim that defendants enforced the dealer agreement in such a way as to favor branch offices over independent dealers. 3PM claims generally that branch offices were accorded preferential treatment, yet two of the three incidents upon which 3PM relies in support of this claim did not even involve branch offices. In its attempts to obtain the Polk sale, 3PM was required merely to compete with B/4's independent dealer in Nashville. Similarly, B/4's refusal to allow 3PM to solicit sales in Florida was designed to protect the territory of B/4's independent dealer in that area. Accordingly, these allegations do not tend to support 3PM's theory of liability under the Sherman Act.

Even if defendants *had* been pursuing a policy designed to replace independent deal-ers with branch offices, however, it is clear under *Ace Beer* and *B & B* that such a course of action does not offend the Sherman Act.[17] Defendants' motion for summary judgment as to Count III must therefore be granted.

## COUNT IV

In Count IV, 3PM alleges that the same acts alleged in Count III constituted a breach of contract. 3PM alleges that defendants' arbitrary and uneven enforcement of the provisions described above prevented 3PM from meeting its quota requirements. It concludes that this interference and B/4's termination of its dealership were material breaches of the dealer agreement.

■ This count must also be dismissed as a matter of law. 3PM claims that defendants' alleged denial of quota credit for sales outside its territory was a breach of the dealer agreement, and claims that its termination for failure to achieve its quota requirements was the result of this breach. Yet it is undisputed that 3PM had no contractual *right* to receive any quota credit for out-of-territory sales, and that defendants therefore had no contractual duty to award such credit. The dealer agreement unambiguously provides that an award of quota credit for such sales was to be within defendants' "sole discretion", and 3PM has made no argument that this provision of the agreement is unenforceable for any reason. Because the parties' agreement did not require defendants to award any quota credit under these circumstances, defendants' alleged failure to do so cannot be regarded as a breach of that agreement.[18]

---

**17.** The only contrary authority offered by 3PM is *Eiberger v. Sony Corp. of America,* 622 F.2d 1068 (2d Cir.1980). For two reasons, *Eiberger* does not aid 3PM in the case at bar. First, the acts alleged in *Eiberger* were significantly different from those alleged in the case at bar. *Eiberger* did not involve a practice which allegedly resulted in the termination of one distributor so that another could be appointed. Rather, it involved a restraint which prohibited *all* distributors from engaging in price competition. Second, the court in *Eiberger* noted that any liability under the Sherman Act resulting from territorial restrictions arose solely under the rule of reason. Plaintiff in that case had presented evidence which established that the alleged restraints maintained retail prices at an artificially high level, eliminated intrabrand competition, but did not enhance interbrand competition. Such a showing is a fundamental element of the offense which 3PM has attempted to allege, and it is an element as to which 3PM has presented no evidence whatsoever.

**18.** 3PM relies upon 5 *Williston on Contracts* § 677 (3d Ed.1961), which provides: "[I]f a promisor is himself the cause of the failure of performance, either of an obligation due him or

 Moreover, the factual basis which is asserted for this claim is clearly deficient. It is undisputed that defendants never prevented 3PM from making a sale to Polk; they merely required 3PM to compete with B/4's Nashville dealer for the sale. There is no indication that 3PM would have been denied quota credit if it had been able to make the sale to Polk.

3PM's complaint does not even allege that it was denied quota credit for the sale of RCA Distributing Corp.; it merely alleges that the allocation of profits was improper. Even if 3PM had alleged and established that the allocation of quota credit was improper, however, this would have awarded to 3PM only an additional 10% of the sale.[19] Even if this disputed amount were to be added to 3PM's sales for the second six-month period, its sales would still have been far less than the quota requirement.

In sum, the allegations in Count IV are clearly lacking in both legal and factual support. Defendants' motion for summary judgment as to this count must therefore be granted.

## C. COUNTS V AND VI

In Counts V and VI, 3PM alleges that B/4 officials made four misrepresentations during the negotiations which led to the execution of the dealer agreement. 3PM alleges that B/4 officials stated that:

1. B/4 intended to have long-term relationships with all of its dealers, including 3PM;

2. B/4 would "protect" its dealers by enforcing the territorial provisions included in the dealer agreement;

3. 3PM would be able to attain the quota requirements set forth in the dealer agreement; and

4. B/4 would not terminate 3PM's dealership for failure to achieve its quota requirements, so long as 3PM was "progressing" in its sales of B/4 equipment.

Complaint at ¶¶ 34, 43.

Defendants do not dispute that the first three statements were made. They do contend, however, that their officials did not make the fourth statement. This dispute of fact is immaterial to a resolution of defendants' motion for summary judgment on these counts. The Court finds that even if all the alleged statements *were* made, defendants are nevertheless entitled to judgment on these counts as a matter of law.

## COUNT V

In Count V, 3PM alleges that it expended considerable money and effort to promote the sale of B/4 products, in reliance on B/4's statement that it would not be terminated for failure to achieve its quota requirements if it was progressing in its sales of B/4 products. Because of this alleged statement and reliance, 3PM contends that B/4 is estopped to terminate its dealership for failure to achieve its quota.

 In order to set up such an estoppel, 3PM must establish that:

1. B/4 intentionally or negligently induced it to believe that it would not be terminated for failure to achieve its quota;

2. 3PM justifiably relied on B/4's statements; and

of a condition upon which his own liability depends, he cannot take advantage of the failure." 3PM contends that its failure to achieve the quota requirements was caused by defendants' refusal to award quota credit, and that defendants should not have taken advantage of that failure by terminating 3PM's dealership. However, the above quoted language is qualified in the following section: "An exception to this principle must be made where the hindrance is due to some action of the promisor which under the terms of the contract or the customs of business he was permitted to take." *Id.* at § 677A. Under the parties' agreement,

defendants were granted discretion to deny quota credit for out-of-territory sales; they were accordingly not prevented from terminating 3PM on the ground that it had failed to meet its quota requirements.

19. 3PM asserts that it received only 40% quota credit for this sale, while it should have received 50%. This represents a difference of only $2,111.04 in quota credit. Even if this additional quota credit had been granted to 3PM, it would have fallen short of its quota requirement by more than $150,000.00.

3. 3PM will be prejudiced unless B/4 is estopped to terminate 3PM's dealership. *Michigan National Bank of Detroit v. Kellam*, 107 Mich.App. 669, 309 N.W.2d 700 (1981); *Berkeley Police Ass'n v. City of Berkeley*, 76 Cal.App.3d 931, 143 Cal. Rptr. 255 (1977).[20] The Court finds that even if this representation were made, and even if 3PM acted in reliance upon it in entering into the agreement and promoting B/4 sales, this reliance was clearly not justifiable. As noted above, Yanover and Squillace requested during the contract negotiations that 3PM's quota requirement be reduced and that B/4 delete from the agreement the provision which permitted B/4 to terminate 3PM's dealership if 3PM failed to meet its quota. B/4 did reduce the quota requirement, but it unequivocally insisted upon retaining the power to terminate 3PM for failure to achieve a provision requested by Yanover, to the effect that 3PM would not be terminated if it was using its best efforts on behalf of B/4.

■ Knowing that B/4 insisted upon retaining the power to terminate 3PM for failure to achieve quota, 3PM executed the written agreement which conferred this power upon B/4. Even if a B/4 official made a statement to the effect that B/4 did not intend to exercise this power, it was clearly unreasonable for 3PM to rely upon this statement in light of the provisions which were included in the written agreement. *Cf. Kearns v. Ford Motor Co.*, 203 U.S.P.Q. 884 (E.D.Mich.1978). Accordingly, 3PM has failed as a matter of law to establish the elements of the estoppel it has alleged, and defendants' motion for summary judgment as to Count V must be granted.[21]

---

20. The parties' dealer agreement provided that "this Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of California." *Id.* at ¶ 30.

21. In addition, 3PM's arguments in relation to Counts V and VI are anomolous in one other respect. The misrepresentation which was allegedly made by B/4 was that 3PM would not be terminated if its sales of B/4 products were "progressing". It is undisputed, however, that 3PM's sales were *not* progressing at the time of its termination. On the contrary, its sales had

## COUNT VI

In Count VI, 3PM alleges that each of the four statements set forth above was made with the intent to induce 3PM to invest in a B/4 dealership, and that 3PM reasonably relied on them in entering into the dealer agreement. 3PM alleges that each of these representations was false, and was known to be false by B/4.[22] 3PM claims that it has suffered damages as a result of this alleged fraud.

■ In order to sustain its claim of fraud, 3PM must establish the following elements:

1. Defendants made a false representation;

2. Defendants knew or believed that the representation was false;

3. Defendants intended to induce 3PM to act in reliance upon the misrepresentation;

4. 3PM justifiably relied upon the misrepresentation; and

5. 3PM suffered damages as a result. *Cormack v. American Underwriters Corp.*, 94 Mich.App. 379, 288 N.W.2d 634 (1979); *Crocker-Citizens National Bank v. Control Metals Corp.*, 566 F.2d 631 (9th Cir.1977) (applying California law). Examining each of the alleged misrepresentations in turn, the Court finds that 3PM has failed as a matter of law to make this showing as to each.

### 1. *B/4's Intent to Have Long-term Relationships with Dealers*

3PM has presented a great deal of evidence which indicates that even before it executed the dealer agreement, B/4 was

---

diminished dramatically, from a six-month period in which it surpassed its quota requirement to a period in which it achieved less than 23% of its quota. Accordingly, B/4's actions in terminating 3PM were not inconsistent with the representation it allegedly made.

22. The gravamen of 3PM's claim in this Count is that B/4 did not intend to have a long-term relationship with 3PM as a dealer. 3PM contends that B/4 hoped to open a company-owned branch office in Detroit, and that 3PM's dealership was terminated so that this could be accomplished.

considering the possibility of opening a branch office in Detroit. Nevertheless, it is far from clear that the statement at issue here was false at the time it was made by B/4. As noted above, 3PM took the position during contract negotiations that the quotas included in the agreement were too high. On March 11, 1977, Donald Kirkwood[23] wrote a letter to Yanover and Squillace in which he stated:

> There is no benefit to Basic/Four Corporation, Walt Schramm or myself to assign unrealistic and unreachable quota objectives. It is our aim to have long term relationships with our dealers and, therefore, it is incumbent on us to be realistic in the demands we set forth. *Conversely, every marketing area in which we have plans to expand has an opportunity value and quota assignments must be made in accordance with these.* By establishing the goals at too low a marketing level we do not realize the potential that is expected, and we enter into a preferential quota restructing which is neither consistent with nor equitable to the other dealers in the program.

Plaintiff's Exhibit 20 (emphasis added). B/4 clearly did *not* represent that it intended to have long-term relationships with its dealers, no matter how poorly those dealers performed under the parties' agreement. Rather, B/4 consistently emphasized the importance of its dealers meeting the quota requirements.

Indeed, this latter point is corroborated by the events which occurred during the parties' contract negotiations. Assuming *arguendo* that this statement was false and that 3PM entered into the dealer agreement in reliance upon it, such reliance was plainly unreasonable. Despite its unhappiness with the provision of the agreement which permitted B/4 to terminate 3PM for failure to meet its quota, 3PM knowingly executed an agreement which included this provision.[24] Even if a B/4 official made a statement during contract negotiations to the effect that B/4 intended to have a "long term relationship", 3PM could therefore not have reasonably believed that it would not be terminated no matter how poor its sales were. Because there remains no material dispute of fact with respect to this essential element of 3PM's claim, the Court finds that this alleged misrepresentation is not actionable as a matter of law.

### 2. *B/4's Intent to Enforce Territorial Provisions in Agreement*

3PM has apparently abandoned its claim that this alleged statement was an actionable misrepresentation, as it has not addressed it at all in its briefs on these motions. In any event, 3PM has produced no evidence that any such statement was false, or that 3PM acted in reliance upon it. Accordingly, no material disputes of fact remain, and this portion of Count VI must be dismissed as well.

### 3. *3PM's Ability to Attain Quota Requirements*

In his March 11, 1977 letter to Yanover and Squillace, Kirkwood stated:

> It would appear at this writing that your only reluctance is the quota assignment. Let me state again unequivocally that I am convinced this is a fair assignment and one which you can accomplish.
>
> \* \* \* \* \* \*
>
> My personal observation is that you established in your own minds, because of a lack of experience with Basic/Four and the small business systems market in Detroit, sales objectives that were far too low, and, therefore, the numbers which we have proscribed (sic) appear to you to be unreachable. Obviously we do not agree, and if you will consider the point that your quota is our quota you must realize that we are confident that you can attain the goals and, in fact, surpass them.

Plaintiff's Exhibit 20. 3PM characterizes this statement as a misrepresentation that

---

**23.** Kirkwood was B/4's Regional Manager of Dealerships.

**24.** The dealer agreement further provided that it could be terminated by either party, for any reason, at the end of its three-year duration. *Id.* at ¶ 5(B).

it would be able to achieve its quota, and contends that it entered into the dealership agreement in reliance upon it.

■ For *two reasons*, the Court finds that this statement did not constitute actionable fraud as a matter of law. First, 3PM has produced no evidence whatsoever that this statement was false—i.e. that the quotas set by B/4 were *not* attainable. In fact, all of the evidence which appears in this record is to the contrary. It is undisputed that the branch office which replaced 3PM in Detroit surpassed the quota requirements which B/4 had earlier imposed on 3PM. Indeed, even 3PM was able to meet its quota requirement in its first six-month period under the dealer agreement. It is clear beyond dispute that 3PM's failure to meet its quota requirement in the second six-month period was not caused by the setting of an excessively high quota, but was rather caused solely by 3PM's poor performance under the agreement. 3PM has raised no dispute of fact on this issue, and the Court must find as a matter of law that the quotas set by B/4 were not unrealistic.[25]

■ Second, Kirkwood's letter merely set forth his opinion regarding 3PM's ability to meet the quota requirements; it was not a statement of fact. Such a statement of opinion cannot provide the basis for an action for fraud. *Connellan v. Himelhoch*, 506 F.Supp. 1290 (E.D.Mich.1981) (applying Michigan law); *Hauter v. Zogarts*, 14 Cal.3d 104, 120 Cal.Rptr. 681, 534 P.2d 377 (1975).

### 4. *B/4's Intent Not to Terminate 3PM if Sales Were Progressing*

As noted above, there is a dispute of fact as to whether B/4 officials told 3PM that it would not be terminated as a dealer if its sales were progressing. This is an immaterial dispute, however; even if the statement were made, it did not constitute actionable fraud.

■ As an initial matter, it cannot be said that this "statement" was false. It is undisputed that 3PM's sales were *not* progressing when it was terminated; B/4's actions in terminating 3PM were therefore not inconsistent with its alleged earlier statements.

Furthermore, even if 3PM actually relied on this alleged statement in entering into the dealer agreement, its reliance was clearly unreasonable. As noted above, 3PM knowingly entered into an agreement under which it could be terminated if it failed to achieve its quota. 3PM could not have reasonably relied on an inconsistent oral statement, particularly after B/4 had expressly refused to include a similar provision in the agreement. 3PM has raised no material dispute of fact relating to this alleged statement, and the Court finds that it did not constitute fraud as a matter of law.

In sum, 3PM has failed as a matter of law to establish that any of the statements allegedly made by B/4 constituted an actionable fraud. Defendants' motion for summary judgment as to Count VI must therefore be granted.

### D. COUNT VII

In Count VII, 3PM merely incorporates all of the allegations included in Counts I through VI. 3PM contends that all of the actions alleged in those counts constituted a conspiracy to restrain trade, in violation of § 1 of the Sherman Act. It is, at best, unclear what sort of antitrust violation is alleged in this count.[26] In any event, 3PM has presented no authority to the effect that this combination of alleged actions may be found to violate the Sherman Act, even though each individual action does not

---

**25.** 3PM has attempted to place into issue the method by which B/4 established quota requirements for each of its dealers. 3PM did not include in its complaint any claims along these lines, and its arguments in this regard are therefore irrelevant to any issue before the Court on these motions.

**26.** 3PM's characterization of this claim in its brief is equally cryptic: "Count VII is a composite of the previous six claims and relies upon their cumulative effect." *Id.* at 3.

violate the Act. Furthermore, the Court has found that each of the claims incorporated into Count VII is without merit as a matter of law. Defendants' motion for summary judgment as to Count VII is therefore granted.

### E. CONCLUSION

3PM has not raised a material dispute of fact as to any of the claims set forth in its complaint. The Court therefore grants defendants' motion for summary judgment, and will dismiss all counts of 3PM's complaint.

IT IS SO ORDERED.