**A.I. ROOT COMPANY, Plaintiff,**

v.

**COMPUTER DYNAMICS, INC., and
Management Assistance, Inc.,
Defendants.**

No. C84–1348.

United States District Court,
N.D. Ohio, E.D.

May 31, 1985.

Eugene McShane, Ralph Breitfeller, Alan Witten, Columbus, Ohio, for plaintiff.

David A. Schaefer, Cleveland, Ohio, for Computer/Dynamics, Inc.

Donald J. Mooney, Jacob K. Stein, Cincinnati, Ohio, for Management Assistance, Inc.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On October 28, 1983, plaintiff, the A.I. Root Company (Root), filed the above-captioned case[1] against the defendants, Computer Dynamics, Inc. (CDI) and Management Assistance, Inc. (MAI). It alleges that CDI and MAI engaged in anti-competitive activity in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.[2] Jurisdiction is invoked pursuant to 15 U.S.C. § 15.[3] The case is currently before the court on CDI's and MAI's motions for summary judgment. For the following reasons, their motions are granted.

## I.

Root is an Ohio corporation that manufactures beekeeper's supplies, ecclesiastical candles and other products in Medina, Ohio.

It has two (2) subsidiaries located in San Antonio, Texas and Council Bluffs, Iowa. MAI is a New York corporation which manufactures Basic Four computer equipment and operating software for that equipment. CDI is an Ohio corporation and MAI's authorized dealer in Medina, Ohio.

Since 1977, Root has purchased from MAI dealers, including CDI, small business computers for payroll and other administrative purposes. In the fall of 1982, it decided to computerize its inventory and manufacturing processes. To do so, it had to upgrade its computer capabilities. CDI offered Root a new MAI Model 710 computer. However, Root purchased a used MAI Model 730B computer from Assured Systems Development, Inc. (ASD)—a dealer in used computers in Cleveland, Ohio. To operate the Model 730B, Root needed properly configured "BOSS"[4] operating software.[5] It obtained a BOSS software package through ASD;[6] however, Root was not satisfied with this software since it did not have an "imput buffering" feature.[7] Root's efforts to have the software recon-

---

**1.** The case was filed initially in the United States District Court for the Southern District of Ohio. On January 6, 1984, Computer Dynamics, Inc., filed a motion for change of venue to the Northern District of Ohio pursuant to 28 U.S.C. § 1404(a). On April 18, 1984, its motion was granted.

**2.** 15 U.S.C. § 1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**3.** 15 U.S.C. § 15 provides in pertinent part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to

the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**4.** BOSS is the acronym for Basic Four Operating System Software. It is a copyrighted product manufactured by MAI and is not usable on non-MAI computers.

**5.** Operating system software is a set of computer programs that guide and control the basic function of a computer. It also provides the necessary link between the computer equipment "hardware" and the various application programs "software," designed to perform specific functions, such as accounting, word processing and payroll. Thus, whenever a user expands its computer system and adds peripheral equipment, the BOSS software must be reconfigured by MAI. If it is not reconfigured, the computer will not function at its full capacity.

**6.** ASD obtained the BOSS software from a MAI dealer in California. The order was placed in the name of J & B Computing, Inc.—the prior owner of the Model 730B purchased by Root.

**7.** Input buffering is a software feature that permits faster data entry.

figured by MAI dealers outside the Cleveland area were unsuccessful and thus it contacted CDI. A dispute arose between Root and CDI over the cost of the proposed reconfiguration services and, also, Root's failure to sign license agreements[8] for software it purchased previously from CDI. *See* MAI's Exhibit C. The parties negotiated for approximately eight (8) months. As of September 2, 1983, CDI offered Root reconfigured BOSS software under the following terms:

1) That Root sign the appropriate license agreements for the BOSS software and other software it already purchased from CDI; and

2) That Root agree to pay a $2,500 transfer fee for any *subsequent* reconfigurations it should need.

MAI's Exhibit C.

Root elected not to accept these terms.[9] Rather, it purchased new IBM equipment and software. This suit followed with Root alleging that CDI's and MAI's concerted refusal to reconfigure its BOSS software constituted a tying arrangement and group boycott in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. *See supra* note 2.

### II.

■ Root alleges that CDI and MAI imposed an unlawful tying arrangement by conditioning the sale of reconfigured BOSS software (the tying product) on its purchase of computer hardware (the tied product). Complaint at ¶ 18. A tying arrangement exists when a seller sells a product (the tying product) only if the buyer will purchase another product (the tied product). *Accord Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, ——, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984); *Fortner Enterprises, Inc. v. United States*

*Steel Corp.*, 394 U.S. 495, 508–09, 89 S.Ct. 1252, 1261, 22 L.Ed.2d 495 (1969); *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 369–71, 85 S.Ct. 1498, 1506–07, 14 L.Ed.2d 443 (1965); *United States v. Loew's Inc.*, 371 U.S. 38, 44–45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962); *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). Under section 1 of the Sherman Antitrust Act, such arrangements are unlawful per se if the seller has "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Bender v. Southland Corp.*, 749 F.2d 1205, 1215 (6th Cir.1984) (citing *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1329–30 (6th Cir.1983); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1127 (6th Cir.1981) ). *See Jefferson Parish Hospital District No. 2, supra*, 466 U.S. at ——, 104 S.Ct. at 1559–60; *Fortner Enterprises, Inc., supra*, 394 U.S. at 49, 89 S.Ct. at 1256; *Northern Pacific Ry. Co., supra*, 356 U.S. at 6, 78 S.Ct. at 518. It bears emphasis that in order to have a per se unlawful tying arrangement, the seller must possess sufficient economic power in the tying product market so that competition in the market is appreciably restrained. *See United States Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *Fortner Enterprises, Inc., supra*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495.

■ Economic power in the tying product market may be established in one of three ways. First, it may be shown that the defendant occupies a dominant position

---

**8.** Although MAI sells computer hardware, it distributes BOSS software only under license agreements which strictly limit the user's rights to reproduce and transfer the software. Murawski Affidavit at ¶ 7.

**9.** In its response to MAI's motion for summary judgment, Root argues that CDI's September

2nd offer is "irrelevant," since it already decided to purchase a new IBM computer on August 30, 1983. The court finds this argument to be without merit because Root has not offered evidence to indicate that it communicated to CDI its decision to discontinue negotiations and buy new equipment from another company.

in the tying product market. *See United States Steel Corp., supra,* 429 U.S. at 620, 97 S.Ct. at 867; *Fortner Enterprises, Inc., supra,* 394 U.S. at 502–03, 89 S.Ct. at 1258; *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1215 (9th Cir.1977). Second, it may be shown that the seller's product is sufficiently unique in that he has "some advantage not shared by his competitors in the market for the tying product." *United States Steel Corp., supra,* 429 U.S. at 620, 97 S.Ct. at 868. *See Fortner Enterprises, Inc., supra,* 394 U.S. at 502–03, 89 S.Ct. at 1258; *Moore, supra,* 550 F.2d at 1215. Lastly, economic power may be demonstrated when a substantial number of customers have accepted the tie-in and there are no explanations other than the seller's economic power for their willingness to do so. *United States Steel Corp., supra,* 429 U.S. at 618 n. 10, 97 S.Ct. at 866 n. 10; *Moore, supra,* 550 F.2d at 1216.

■ Because CDI and MAI do not have the required economic power to impose the alleged tie-in, the court holds that Root has not established a per se tying arrangement.

### A. Dominant Market Position

■ It is uncontroverted that MAI's share of the relevant product market [10] in 1982–83 was only 2%–4%. *See* Murawski Affidavit at ¶¶ 13–17.[11] This market share is insufficient as a matter of law to infer market dominance. *Accord Jefferson Parish Hospital District No. 2, supra,* 466 U.S. at ——, 104 S.Ct. at 1566 (30% market share insufficient to infer market power); *JBL Enterprises Inc. v. Jhirmack Enterprises, Inc.,* 698 F.2d 1011, 1017 (9th Cir.) (seller lacked economic power in tying product market since its share of the relevant

market did not exceed 5%), *cert. denied,* —— U.S. ——, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1379 (9th Cir.1981) (market share of 1.87%–5.2% too small to establish market dominance), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981); *Blackwell v. Power Test Corp.,* 540 F.Supp. 802, 816 (D.N.J.1981) (market share of 6% is insufficient to establish economic power in the tying product market), *aff'd without opinion,* 688 F.2d 818 (3d Cir.1982). Accordingly, the court holds that CDI and MAI did not have a dominant position in the market during 1982–83.

### B. Uniqueness of Tying Product

Root asserts that BOSS operating software is unique and thus CDI and MAI possessed sufficient market power. "Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves." *United States Steel Corp., supra,* 429 U.S. at 621, 97 S.Ct. at 868. To prevail, Root must prove that no competitor of CDI and MAI produced or could have produced a comparable product. *Id.,* 97 S.Ct. at 868; II E. Kintner, Federal Antitrust Law 238 (1980). In *3 P.M., Inc. v. Basic Four Corp.,* 591 F.Supp. 1350 (E.D.Mich.1984), Judge Phillip Pratt held that Basic Four's software products are not unique as MAI's competitors produce comparable products. In so holding, the court stated:

> [Plaintiff's] burden, rather, is to prove that none of defendants' competitors *could have* produced products which

---

**10.** Root defines the relevant market as one limited to Basic Four computer hardware and software. Such a narrow definition is erroneous. "The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service." *White and White, Inc. v. American Hospital Supply Corp.,* 723 F.2d 495, 500 (6th Cir.1983) (citing *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ). *See Brown Shoe, Inc. v. United States,* 370 U.S. 294,

325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1961). In this case, it is undisputed that there are competing computer systems that are identical to those manufactured by MAI and distributed by CDI. Such competing brands are available substitutes for Basic Four hardware and software. Thus, the court finds that the relevant market is that of small business computers.

**11.** Frank Murawski is a research consultant and analyst for MAI.

would perform the functions performed by defendants' products, because defendants possessed some advantage not shared by their competitors. [Plaintiff] has not even attempted to make such a showing. In fact, the only evidence on this record which is relevant to this issue suggests that defendants' competitors *could have* produced similar products, and had actually begun to produce such products subsequently. Robert Yanover, [plaintiff's] president testified at his deposition that [plaintiff] now sells equipment manufactured by one of B/4's competitors which is the "functional equivalent" of the B/4 equipment which [it] earlier sold. Yanover Deposition at 70. In addition, William Bittick, a programmer for [plaintiff], has stated in an affidavit that "other computer manufacturers are now offering new business basic programming languages patterned after the Basic/Four Business Basic Language." [Plaintiff] has produced no evidence which tends to show that none of defendants' competitors could have offered similar products during the period at issue.

591 F.Supp. at 1358–59.

■ In this case, Root concedes that competitors of CDI and MAI, including IBM, NCR and Seiko, produce computer hardware and software equivalent to that manufactured by MAI. *See* Root Deposition at 93–94; Burke Deposition at 18–19. *See also* Benjamin Deposition at 188 (BOSS operating system not unique as compared to Altos and IBM operating systems); Vedrody Deposition at 59 (other operating software has advantages over BOSS software). However, Root asserts that BOSS software is unique because it is copyrighted. In *3 P.M., Inc., supra,* Judge Pratt rejected the same argument:

Similarly, the fact that some of B/4's software is copyrighted does not establish that defendants possessed economic power. *See In Re Data General Corp. Antitrust Litigation, supra,* 490 F.Supp. at 1112 ("[T]he sole fact of the existence of a copyright notice has not been held sufficient to prove economic power"). In arguing to the contrary, 3 PM relies upon *United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). In *Loew's,* the Court held that each of a number of copyrighted motion pictures was a unique product, and that the defendants who sold or licensed these films therefore possessed economic power. However, this finding was not based merely upon the fact that each film was copyrighted; rather, the Court found that each of the films "varied in theme, in artistic performance, in stars, in audience appeal, etc." *Id.* at 48, 83 S.Ct. at 104. Thus the copyrighted nature of the B/4 software, standing alone, similarly fails to establish that the B/4 units were "unique" as that term has been defined in *Fortner II.*

591 F.Supp. at 1359. *See also Rex Chainbelt Inc. v. Harco Products, Inc.,* 512 F.2d 993 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975). Accordingly, the court finds that BOSS operating software is not unique.

### C. Acceptance of Tie-in

In *Fortner Enterprises, Inc., supra,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495, the Supreme Court indicated that economic power in the tying product market may be established by showing that the alleged tie-in had been imposed on an "appreciable number" of customers. 394 U.S. at 503–04, 89 S.Ct. at 1259.[12] In *United States Steel*

12. The Court stated:

Market power is usually stated to be the ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices. Even a complete monopolist can seldom raise his price without losing some sales; many buyers will cease to buy the product, or buy less, as the price rises. Market power is therefore a source of serious concern for essentially the same reason, regardless of whether the seller has the greatest economic power possible or merely some lesser degree of appreciable economic power. In both instances, despite the freedom of some or many buyers from the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—

*Corp., supra,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80, the Supreme Court held that even if the tie-in has been accepted by a large number of customers,[13] the plaintiff is still required to prove (1) that the seller possesses economic power to raise prices and (2) that there is an absence of any other explanation for the buyers' willingness to accept such an arrangement. 429 U.S. at 618 n. 10, 620 n. 13, 97 S.Ct. at 867 n. 10, 868 n. 13. *See* 2 J. von Kalinowski, Antitrust Laws and Trade Regulation at § 66.05[2] (1983).

Root has failed to meet its burden. Indeed, it has identified only three (3) customers that accepted the alleged tie-in. Root did not; rather, it purchased new and comparable computer products from IBM. Failing to demonstrate that an appreciable number of customers accepted the alleged tie-in and that CDI and MAI possessed the economic power to raise prices, Root cannot prevail and the court so holds. *Accord 3 P.M., Inc., supra,* 591 F.Supp. at 1360–61.

In sum, Root has raised no disputed issues of material fact as to CDI's and MAI's lack of sufficient economic power in tying product market. The facts are uncontroverted that Root was not forced to purchase computer hardware from CDI and MAI due to their market power. Indeed, Root and other buyers were and are free to choose among various sellers offering comparable computer hardware and software. As a matter of law, Root has failed to prove a per se violation of section 1.

### III.

■ "In order to prevail in the absence of per se liability, [Root] has the burden of

proving that the [alleged tie-in] violated the Sherman Act because it restrained competition." *Jefferson Parish Hospital District No. 2, supra,* 466 U.S. at ——, 104 S.Ct. at 1567. *See Ware v. Trailer Mart, Inc.,* 623 F.2d 1150, 1153–54 (6th Cir.1980). Under this theory, commonly referred to as the "rule of reason," Root must "establish the facts peculiar to the business involved, its condition before and after the alleged restraint was applied, the nature and history of the alleged restraint, the reason for adopting the alleged restraint, and its actual probable effect." *3 P.M., Inc., supra,* 591 F.Supp. at 1361 n. 16 (citing *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918) ). *See Jefferson Parish Hospital District No. 2, supra,* 466 U.S. at ——, 104 S.Ct. at 1567–68. Root, however, has maintained that the alleged tying arrangement is per se illegal. Further, its reference to the rule of reason in its Memorandum in Opposition to MAI's Motion for Summary Judgment, is limited to the following: "[E]ven if MAI's claim that it lacks market power were correct, summary judgment would impermissably [sic] cut off plaintiff's right to prove its case under the rule of reason." *Id.* at 28.

■ Rule 56(e) of the Federal Rules of Civil Procedure provides in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If

can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product. *Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any*

*appreciable number of buyers within the market.*
394 U.S. at 503–04, 89 S.Ct. at 1259 (emphasis added).

**13.** In *United States Steel Corp., supra,* the Court noted that although a large number of customers accepted the alleged tie-in, such evidence standing alone was insufficient to establish the requisite economic power.

he does not so respond, summary judgment, if appropriate, shall be entered against him.

CDI and MAI have moved for summary judgment on all counts of Root's complaint. Root cannot avoid their motions by asserting, without proof, an alternative theory of recovery. Rather, it was required to present sufficient evidence supporting its rule of reason claim to demonstrate that there is a genuine issue of material fact. *See Bouldis, supra,* 711 F.2d at 1324 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159 & n. 19, 90 S.Ct. 1598, 1609 & n. 19, 26 L.Ed.2d 142 (1970); *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 947–48 (6th Cir.1983)). Because it failed to do so, CDI and MAI are entitled to and the court grants their motions for summary judgment.

### IV.

In a further attempt to establish a per se section 1 violation, Root alleges that the license agreements and future transfer fee imposed by CDI and MAI constituted a group boycott. This claim is without support as a matter of law.

■ A horizontal restraint is an agreement among independent business entities or competitors at the same market structure level. *Accord Dunn & Mavis, Inc. v. Nu-Car Driveway, inc.,* 691 F.2d 241, 243 (6th Cir.1982); *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1196 & n. 9 (6th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404, 408 (6th Cir.1982). "The hallmark of such a restraint is a collusion among competitors." *Laurence J. Gordon, Inc. v. Brandt, Inc.,* 554 F.Supp. 1144, 1151 (W.D.

Wash.1983) (citing *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1354 (9th Cir.1982)). On the other hand, vertical restraints involve a combination of persons at different market structure levels, such as manufacturers and distributors. *Accord Com-Tel, Inc., supra,* 669 F.2d at 409 (citing *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978)); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981). It is important to distinguish between horizontal and vertical restraints of trade because horizontal restraints are per se violations of section 1 while vertical restraints are judged under the rule of reason. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Davis-Watkins, Co., supra,* 686 F.2d at 1196; *Com-Tel, Inc., supra,* 669 F.2d at 408.

■ In this case, it is uncontroverted that CDI and MAI are not competitors. Rather, their relationship is that of a manufacturer and authorized dealer. Thus, a restrictive agreement between them would be vertical, not horizontal. *See Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786 (5th Cir.1982); *Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74 (6th Cir.1981); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376 (9th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). Because a group boycott [14] requires a horizontal conspiracy, Root's group boycott claim is without support. *See Dunn & Mavis, Inc., supra,* 691 F.2d at 243; *Davis-Watkins Co., supra,* 686 F.2d at 1196 & n. 9; *Ron Tonkin Gran Turismo v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1381–82 (9th Cir.1981), *cert. denied,* 454 U.S. 831, 102

---

**14.** "Group boycotts are concerted refusals by traders to deal with other dealers...." *Davis-Watkins Co., supra,* 686 F.2d at 1196 n. 9 (citing

*Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1957)).

S.Ct. 128, 70 L.Ed.2d 109 (1981); *Laurence J. Gordon, Inc., supra,* 554 F.Supp. at 1152.

## V.

When a restraint is weighed under the rule of reason, the challenger bears the burden of proving the unreasonableness of the alleged restriction. *See Continental T.V., Inc., supra,* 433 U.S. at 59, 97 S.Ct. at 2562. Root must prove that the activity of CDI and MAI, on balance, affected competition in the relevant market adversely. *See supra* section III. Root has not, however, come forward with such evidence. Further, in light of CDI's and MAI's insignificant market power in the highly competitive market of small business computers, their activities are incapable of having a substantially adverse effect on competition. Indeed, Root's decision not to accept the alleged restriction and to purchase a competing brand of computer hardware and software buttresses this finding. Accordingly, Root has failed in its burden to establish a restraint of trade in violation of section 1 of the Sherman Act.

## VI.

This court is not unmindful that motions for summary judgment are generally disfavored in antitrust litigation. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Bouldis, supra,* 711 F.2d at 1324. "However, this general rule does not preclude the use of summary judgment in appropriate antitrust litiga-

tion." *Bouldis, supra,* 711 F.2d at 1324 (citations omitted). In order to withstand a motion for summary judgment, it is not enough to refer to disputed factual issues; rather, such issues must be material and thus affect the outcome of the litigation. *See Mutual Fund Investors, Inc. v. Putnam Management Co., Inc.,* 553 F.2d 620, 624 (9th Cir.1977). Further, " '[t]he showing of a "genuine issue for trial" is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law'." *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir.1972) (quoting *McGuire v. Columbia Broadcasting System, Inc.,* 399 F.2d 902, 905 (9th Cir.1968)).

Root has failed to sustain its burden of proof. It cannot prevail as a matter of law under its asserted version of the facts. Accordingly, CDI's and MAI's motions for summary judgment are granted.[15]

IT IS SO ORDERED.

---

**15.** CDI asserts a permissive counterclaim pursuant to Fed.R.Civ.P. 13(b). In essence, it seeks to compel Root to sign two (2) license agreements for software it purchased previously from CDI. It is well-settled that a permissive counterclaim must be supported by an independent source of jurisdiction. *See McCaffrey v. Rex Motor Trans-portation Inc.,* 672 F.2d 246, 248 (1st Cir.1982); *Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798, 812 (2d Cir.1979); 6 Wright & Miller, Federal Practice and Procedure § 1422. Since Root and CDI are citizens of Ohio, federal diversity jurisdiction does not lie. Accordingly, CDI's counterclaim is dismissed without prejudice.