**A.I. ROOT COMPANY,**
**Plaintiff-Appellant,**
**v.**
**COMPUTER/DYNAMICS, INC. and**
**Management Assistance, Inc.,**
**Defendants-Appellees.**

**No. 85–3519.**

United States Court of Appeals,
Sixth Circuit.

Argued April 4, 1986.

Decided Dec. 2, 1986.

Alan C. Witten (argued) McShane, Breitfeller & Witten, Columbus, Ohio, for plaintiff-appellant.

David Schaefer (argued), Cleveland, Ohio, Donald J. Mooney, Jr. (argued), Cincinnati, Ohio, for defendants-appellees.

Before KEITH, NELSON and BOGGS, Circuit Judges.

KEITH, Circuit Judge.

Plaintiff, A.I. Root Company appeals a summary judgment rendered for Computer Dynamics, Inc. (CDI) and Management Assistance, Inc. (MAI), in this anti-trust case alleging an illegal tying arrangement and group boycott. A.I. Root alleged that CDI and MAI engaged in anti-competitive activity in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982). The case was heard in the United States District Court for the Northern District of Ohio, Eastern Division. Defendants filed a motion for summary judgment May 22, 1984, primarily contending they lacked the requisite market power for an illegal tying arrangement. Judge John Manos issued a Memorandum Opinion May 31, 1985, granting summary judgment for defendants. This opinion can be found in the official reporter as *A.I. Root Company v. Computer Dynamics, Inc.*, 615 F.Supp. 727 (N.D. Ohio 1985). We affirm.

## I.

### FACTUAL BACKGROUND

A.I. Root Company is an Ohio corporation, manufacturing beekeeper's supplies, ecclesiastical candles, and other products in Medina, Ohio. MAI is a New York corporation which manufactures Basic Four computer equipment and operating software for that equipment. CDI is an Ohio corporation and MAI's authorized dealer in Medina, Ohio. Since 1977, A.I. Root Company had purchased small business computers from MAI dealers, including CDI. In 1982, Root decided to upgrade its computer capabilities by computerizing its inventory and manufacturing processes. CDI offered Root a new MAI Model 710 computer. However, Root purchased a used Basic Four computer from Assured Systems Development, Inc. (ASD)—a dealer in used computers in Cleveland, Ohio.

Root had been using a set of computer programs known as the Basic Operating Software System (BOSS), to operate its earlier machines. These programs constitute *operating* software necessary to oper-

ate the computer generally and to support *applications* software; applications software consists of programs performing specific data-processing tasks. Root approached CDI for reconfigured BOSS software which was necessary to operate properly its newly-purchased Basic Four Model 730B. Root alleged that CDI offered to sell the reconfigured BOSS software only if Root signed licensing agreements concerning applications software.[1]

This licensing agreement would have required Root to:

(1) Use only computer hardware manufactured by MAI with Root's applications software; and

(2) Purchase for a "transfer fee" CDI's programming services each time Root acquired an updated or different Basic Four computer.

Root contends that these terms constitute an unlawful tying arrangement by conditioning the sale of a reconfigured BOSS software (the tying product) on Root's signing the application software license (the tied product). Rather than accede to the above arrangement, Root purchased new IBM equipment and software.

## II.
## DISCUSSION

We uphold the summary judgment for defendants, finding no illegal tying arrangement. In so doing, we are not unmindful that motions for summary judgment are generally disfavored in antitrust litigation. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, this circuit has held that summary judgment may be appropriate where trial would merely result in delay and expense. *See Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1324 (6th Cir.1983). A trial in the present case would not be appropriate. There is no legal theory under the asserted version of facts which can support an illegal tie; summary judgment is therefore appropriate.

In *Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123, 1127 (6th Cir.1981) quoting *Fortner Enterprises v. U.S. Steel,* 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969)), this court stated the requisites of an illegal tie-in as follows:

1. There must be a tying arrangement between two distinct products or services;

2. The defendant must have sufficient economic power in the tying market to appreciably restrain competition in the tied product market.

3. The amount of commerce affected must be "not insubstantial."

We conclude that MAI did not possess the requisite "economic power" for an illegal tie. Significantly, MAI controlled only 2–4% of the small computer market. This market share is insufficient as a matter of law to infer market dominance. *Accord Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 26, 104 S.Ct. 1551, 1566, 80 L.Ed.2d 2 (1984) (30% market share insufficient to infer market power).

Appellant Root would have us circumvent the above finding in a number of ways. Root argues that the relevant market is not small business computers, but rather equipment using BOSS software as a unique product market. We disagree. The relevant market in this case is small business computers. In *White & White, Inc. v. American Hospital Supply Corp.,* 723 F.2d 495, 500 (6th Cir.1983) this court held that:

The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendants' product or service.... This comparative analysis has been characterized as the "reasonable interchangeability" standard.

The court below found, and we agree, that competitors of CDI and MAI, including

---

1. Root had previously acquired applications software and programming services without any restrictions.

IBM, NCR and Seiko, could produce computer hardware and software equivalent to that manufactured by MAI. 615 F.Supp. at 732. Accordingly, the equipment using BOSS software did not compose a separate and distinct submarket within the computer industry as to which we should measure "market share."

■ Root would also have us confer the requisite "economic power" for a tie on BOSS, relying on *United States v. Loew's, Inc.*, 371 U.S. 38, 44, 83 S.Ct. 97, 101, 9 L.Ed.2d 11 (1962), which states "[t]he requisite economic power is presumed when the tying product is patented or copyrighted." It is uncontested that the BOSS product is copyrighted. Nonetheless, we find the pronouncement in *Loew's* to be overbroad and inapposite to the instant case. Accordingly, we reject any absolute presumption of market power for copyright or patented product, based on the cogent reasoning in Note, *The Presumption of Economic Power for Patented and Copyrighted Products in Tying Arrangements*, 85 Colum.L.Rev. 1140 (1985). The article notes that the evil of tie-ins exists only when the tying product can force consumers to buy an unwanted tied product. This exists only when the tying product confers great market power, evidenced by an exceptional demand for the tying product. However, such a presumption is not warranted merely by existence of a copyright or patent.[2] "More often than not, however, a patent or copyright provides little, if any, market power." *Id.* at 1156.

■ The above analysis is reflected in Justice O'Connor's concurrence in *Jeffer-*

*son Parish Hospital.* Although the majority cites *Loew's* for the proposition that "a patent or similar monopoly" confers market power, 466 U.S. at 16, 104 S.Ct. at 1560, Justice O'Connor, in a footnote, states a more realistic view of the significance of a copyright or patent in tying cases:

> A common misconception has been that a patent or copyright, a high market share, or an unique product that competitors are not able to offer suffice to demonstrate market power. While each of these factors might help to give market power.... a patent holder has no market power in any relevant sense if there are close substitutes for the patented product.

466 U.S. at 37 n. 7, 104 S.Ct. at 1572 n. 7. To reiterate, the equipment using BOSS software in the instant case had "close substitutes." Therefore, the fact that BOSS is copyrighted is not determinative of "market power."

Lower court opinions, cited by the court below, have also adopted this more realistic analysis of copyright as a presumption of market power. The *Loew's* holding was discussed and distinguished in *In Re Data General Corp. Antitrust Litigation*, 490 F.Supp. 1089, 1112 (N.D.Cal.1980) which stated:

> Notwithstanding implied suggestions to the contrary, the sole fact of the existence of a copyright notice has not been held to be sufficient to prove economic power.... The Second Circuit has explained that a presumption of economic power arose in *Loew's* not merely from

---

**2.** The Note explains at 1150 "The mere existence of a patent or copyright does not create a demand for a product. Indeed, the majority of all patents and copyrights confer little or no monopoly power. A cursory examination of the market structure for patented or copyrighted goods bears this out. Since each seller's product is differentiated, buyers are matched with sellers on the basis of the buyer's preference. The market is thus not perfectly competitive, since a seller may raise prices without losing every buyer to another seller. The buyer may continue to purchase the goods because his preference for it outweighs the price disincentive. Even if a seller is exacting supernormal profits,

it is not necessarily the patent or copyright which allows him to do so. The potential for supernormal profits exists because of barriers to entry, divergent costs, or strong consumer preferences for one of the products. Central to the issue of whether a producer can exact these profits is the existence of adequate substitutes that can be produced at roughly the same cost. If such substitutes exist, supernormal profits are impossible to sustain. However, the existence of a patent or copyright provides little, if any, evidence of supernormal profits, barriers to entry, consumer preferences, or absence of adequate substitutes."

the existence of the copyright on the tying products but from "the attractiveness of some of the films, as constrasted to the inferior quality of the others also required to be purchased in the package." (quoting *Capital Temporaries, Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 663 (2d Cir.1974)).

The presumption of "market power" for a copyright or patent was also rejected in *3 P.M., Inc. v. Basic Four Corp.*, 591 F.Supp. 1350 (E.D.Mich.1984). The court in *3 P.M., Inc.*, held that the copyrighted product must have some "unique" feature, not possessed by competitors, in order for a presumption of market power to arise.

Root argues the holdings of *In Re Data General* and implicitly *3 P.M., Inc.*, *supra* have been reversed by *Digidyne Corp. v. Data General*, 734 F.2d 1336 (9th Cir.1984). We disagree. Although *Digidyne* cites *Loew's* for the proposition that copyright raises a presumption of economic power, *Digidyne* at 1341, the case is readily distinguishable on the facts. In *Digidyne*, unlike the instant case, the tying product (RDOS), a computer command system, was unique. The court held there was a "special attraction" of RDOS: there was testimony that RDOS was "the best in the industry, the most comprehensive, field proven, compatible." *Ibid.* In contrast, there was no evidence that BOSS was particularly unique or desirable.[3]

Finally, we find no tie-in based on *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 506 (6th Cir.1983), which holds that "[a] tie-in requires proof that the second [or tied] item is forced upon the buyer as a condition of the original

sale...." It appears from appellant's brief and memorandum in opposition to defendant's motion for summary judgment that the alleged tie-in did not require purchase of a tied product as of the original sale, but was rather *prospective*. For example, appellant's memorandum in opposition to summary judgment states: "The proposed license agreements [the tie-in] would require the payment of transfer fees designed to force Root to purchase *future* software services from CDI ..." (emphasis added) (Joint Appendix at 65). There was no evidence offered that Root could not purchase BOSS unless it *contemporaneously* bought a tied product.

In conclusion, we find no illegal tying arrangement. MAI controlled only 2–4% of the small computer market and the BOSS system was not unique as to be a particularly sought after tying product; it could not coerce customers into buying an unwanted tied product. MAI and CDI did not engage in the type of anti-competitive conduct proscribed by the antitrust laws. In *Jefferson Parish Hospital v. Hyde*, 466 U.S. at 12, 104 S.Ct. at 1558, the court stated: "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere." Such an "essential characteristic" was palpably absent in the instant case.

We agree with the district court's summary judgment of Root's "group boycott" claim. The claim is meritless, and warrants no further discussion.

---

**3.** It is somewhat unclear whether the *Digidyne* decision depends on the above-mentioned unique characteristics of RDOS (the operating system there) standing alone, or on the unique applicability of RDOS to its associated computer hardware (the opinion emphasized that 93% of RDOS sales were made to customers already owning the hardware). Here, as in *Digidyne* where a witness testified that RDOS was "the only fully service operating system available for the NOVA," 734 F.2d at 1341, n. 2, BOSS is the only operating system available for Basic Four equipment. However, in contrast to the facts in *Digidyne*, the record here shows that the *combination* of BOSS and Basic Four Equipment was not particularly unique or desirable in competition with other small business computer/software *combinations*. Because we have concluded that the relevant market here is small business computers (i.e., small business computer hardware combined with appropriate operations software), we must disagree with *Digidyne* to the extent that it might depend on the unique applicability of RDOS to its associated computer hardware.

Accordingly, for the above reasons, we affirm the summary judgment orders below.