**Rosalind MERRIWEATHER, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES, a foreign corporation, Defendant.**

No. 88–CV–72299–DT.

United States District Court, E.D. Michigan, S.D.

May 10, 1989.

---

Joseph A. Golden, Lionel J. Postic, Southfield, Mich., for plaintiff.

Joseph A. Ritok, Jr., Lauren A. Rousseau, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

This suit involves an employment dispute. Plaintiff, a black female, is a resident of the state of Michigan and is a former employee of defendant. Defendant, International Business Machines (IBM), is a New York corporation which maintains its principal place of business in New York. IBM maintains sales offices within the State of Michigan.

This matter is currently before the Court on defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff instituted this suit on May 10, 1988, in the Wayne County Circuit Court for the State of Michigan. Plaintiff's Complaint asserts three counts—a count for race discrimination in contravention of the Michi-

gan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.;* a count for intentional infliction of emotional distress; and a count for breach of contract arising out of failure to pay commissions due. The lawsuit was timely removed to this Court pursuant to 28 U.S.C. § 1441, based upon diversity of citizenship, 28 U.S.C. § 1332(c). Discovery is now complete, plaintiff has responded to the instant motion, and the matter is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. *Blakeman v. Mead Containers,* 779 F.2d 1146 (6th Cir.1985); Fed.R.Civ.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). In applying this standard, the Court must view all materials offered in support of a motion for summary judgment, as well as all pleadings, depositions, answers to interrogatories, and admissions properly on file in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Cook v. Providence Hosp.,* 820 F.2d 176, 179 (6th Cir.1987); *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). In deciding a motion for summary judgment, the Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512. Although summary judgment is disfavored, this motion may be granted when the trial would merely result in delay and unneeded expense. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir.1986). Where the non-moving party has failed to present evidence on an essential element of their case, they have failed to meet their burden and all other factual disputes are irrelevant and thus summary judgment is appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

## FACTS

Plaintiff commenced her employment with IBM in November, 1976, as an account marketing representative trainee. After completion of a training period, plaintiff was assigned a sales territory and quota. Plaintiff's performance was satisfactory from 1976 to 1980.

In 1981, plaintiff's only child died and her marriage ended in divorce. As a result, plaintiff was no longer able to perform her job duties with the same proficiency she had in the past.[1] From sometime in 1981, through 1984, plaintiff's job performance declined.

In 1982 plaintiff did not meet her sales quota and in 1982 and 1983, plaintiff received performance reviews which were at the low end of satisfactory.

---

**1.** By plaintiff's own admission, her personal problems affected her job performance:

... [F]or whatever reason, I had a failed marriage. Now, out of all these years, 1981 through 1984, all of the things that I could do effectively and successfully from 1977 to 1980 all of a sudden I can't do those and it seemed as though these people were taking the very last thing that I had left, all I had was a job....

Merriweather dep. p. 213.

In 1984, plaintiff was assigned a new marketing manager, Margo Eurick, and a new sales territory. Eurick provided plaintiff with a document entitled "1984 Last Half Action Plan," a plan which specifically outlined conduct to be performed by plaintiff in order for her to meet her goals for 1984. Merriweather dep., p. 166. Eurick also provided plaintiff with an "Employee Development Plan" which provided suggestions for improvement of plaintiff's performance. *Id.* at p. 182. Notwithstanding the action taken by Eurick, plaintiff testified that Eurick was trying to fire her. *Id.* at p. 164. Plaintiff submits that her sales territory was too small to satisfy the sales quota imposed upon her. *Id.* at pp. 162, 186. However, plaintiff does not recall ever requesting additional sales territory. *Id.* at p. 186.

Plaintiff was on sick leave from October through December, 1984. During that period, plaintiff filed an "open door"[2] complaint with IBM management. Plaintiff alleged that she was treated unfairly by Eurick. However, plaintiff did not claim the unfair treatment was the result of race discrimination.[3] Ultimately, IBM agreed to temporarily take plaintiff out of the sales force, off quota and into a six-month re-education program which she commenced after returning from sick leave.

For the first six months of 1985, plaintiff's only job duty was to prepare for and attend re-training classes. *Id.* at p. 200. Plaintiff was not given a sales territory, she was not expected to make any sales calls and she was not required to meet a quota. *Id.*

Plaintiff was scheduled to return to the sales force in June, 1985. However, rather than returning to work plaintiff again claimed sick leave due to her emotional state. *Id.* at pp. 220–222.

While on her second sick leave, plaintiff retained counsel to negotiate a return to work in a low stress position that did not impose sales quotas. Plaintiff returned to work in April, 1986, with her doctor's approval. Plaintiff was placed in IBM's Detroit Renaissance Center office and given the position of overlay software representative in training. Plaintiff was placed under the supervision of marketing manager Jeff Ray. Plaintiff was given the position of overlay software representative because it greatly reduced the stress of a full sales quota.[4] An overlay software representative is assigned a quota, however, an overlay software representative receives credit for each piece of software sold by the account marketing representatives of the branch. Thus, if branch sales are up, an overlay software representative can achieve quota without making a sale. This quota system recognizes a presumption that the product knowledge and marketing skills of the overlay software representative contribute to branch success.

In April, 1986, plaintiff was provided a performance plan that required her to complete a training period to educate her regarding IBM's various software products and marketing techniques. The training period lasted five months. During the training period plaintiff met the branch account marketing representatives and eventually escorted them on customer calls. The training period ended in August and in September, 1986, plaintiff fully undertook her duties as overlay software representative. Plaintiff also received a written evaluation which gave her a low but satisfactory rating.

The evaluation provided, in part:

OFFICE SKILLS DEVELOPMENT

While Roz attended classes that specialized in office systems, she recognizes a

---

**2.** An "Open Door" complaint is an internal grievance procedure wherein salary employees make known to upper management complaints about working conditions or on-the-job treatment.

**3.** Merriweather dep. p. 194. In addition, plaintiff has testified that throughout her employment, Margo Eurick never treated her differently because of her race. *Id.* at p. 166.

**4.** The parties do not elaborate on whether plaintiff was given the position of overlay software representative as a result of negotiation with IBM by plaintiff's counsel, or whether IBM placed plaintiff in that position on its own accord.

need to enhance her DISOSS and PC software skills. She has not demonstrated her understanding of connectivity to her manager.... Roz is aware that her technical credibility is key to her success and has an action plan in place to develop her proficiency immediately.

\*     \*     \*     \*     \*     \*

... While [Roz] was expected to prove herself through at least three formal demos and presentations, she only completed one formal presentation on AS and one informal presentation of AS in a call at AAA. Roz understands demos and presentations are an intrinsic part of the successful sell cycle....

The evaluation listed three areas that needed improvement: (1) initiative in closing business; (2) enhancement of office technical skills; and (3) meeting commitments to management.

From September to December, 1986, plaintiff's performance was sub-par. Plaintiff's lack of product and marketing knowledge caused the account marketing representatives to avoid utilizing her assistance. Marketing Manager Steve Miltenberger documented some of the complaints received from account marketing representatives in a memo to plaintiff's supervisor, Jeff Ray, dated November 6, 1986. The memo stated that plaintiff's product knowledge was very weak and that plaintiff often requested meetings to cover material discussed in previous meetings. Miltenberger stated he was concerned about the credibility of the entire account team. In December, 1986, Jeff Ray informed plaintiff that if she did not improve her performance she would receive an unsatisfactory rating on her next formal evaluation.

On April 2, 1987, plaintiff received an unsatisfactory performance evaluation.

The evaluation indicated plaintiff failed to meet job expectations in the areas of customer plans and programs, territory objectives and professional responsibilities. The evaluation was summarized as follows:

Roz is a positive and eager member of the branch. Her efforts must, however, be weighed against her results and contribution. She has not met her marketing objectives. She has not been an active participant and contributor to a win and was not at all involved in a key loss. She does not understand the realistic opportunity in the office and is not conversant with current marketing situations. She has not maintained a working plan of her accounts. She has not developed an Executive Education Plan. Her peer credibility continues to suffer based on lack of product knowledge and effective use of their time. She must improve in her use of resources. Her leadership has not been demonstrated in a successful marketing effort. She is respected for her positive "Can Do" attitude and sincere desire for improvement, but is not meeting the requirements of the job. Roz's overall performance does not meet the requirements of the job.

After receiving her April, 1987, evaluation, plaintiff filed her second open door complaint. Again, plaintiff alleged she had been treated unfairly but the unfair treatment was not alleged to be related to race. An investigator was assigned to the complaint. The investigator concluded that plaintiff was treated fairly and thus, plaintiff was placed on a ninety-day improvement plan.[5]

The improvement period commenced on May 22, 1987. Plaintiff was provided a six-point marketing objective plan that required:

Since an employee is placed on an improvement plan as a consequence to an unsatisfactory performance review, the Court accepts defendant's conclusion that the investigator found plaintiff's second Open Door complaint to be without merit. If plaintiff's open door complaint was found to be meritorious, the unsatisfactory performance review would have been retracted.

---

5. It is defendant's position that the investigator found that plaintiff was not treated unfairly. Plaintiff's response brief does not challenge defendant's assertion. However, nothing in the record expressly states the investigator's finding. Plaintiff testified that she did not recall the results of the investigation. Merriweather dep. p. 371. Plaintiff recalled, however, that the investigator told her she would have to go on an improvement plan.

1. Identification of five marketing opportunities in the 90–day period;
2. Qualify opportunities with input from branch reps and marketing management;
3. Develop effective marketing strategies with the objective of selling and/or installing product identified in plaintiff's five marketing opportunities by August 31, 1987;
4. Identification of milestones for above mentioned strategies that allow for the closing of business by August 31, 1987;
5. Meet milestone dates; and
6. Make plan changes with management concurrence.

The plan outlined territory objectives and professional responsibilities. The plan also provided that:

[f]ailure to satisfactorily complete any phase of the improvement plan or failure to demonstrate immediate marked and sustained performance improvement during the improvement period will result in your termination from IBM at any time during the improvement period.

Plaintiff's supervisor, Jeff Ray, offered plaintiff advice during the 90–day improvement period and stressed to plaintiff the need to close sales within the ninety-day period. Merriweather dep. p. 384. In addition, Ray referred plaintiff to an IBM systems engineer to aid plaintiff with her forecasting abilities. *Id.* at p. 378. Pursuant to the plan, Ray asked plaintiff to submit her five prime sales opportunities. Plaintiff identified five clients, but changed the prospective clients several times during the improvement period. *Id.* at pp. 415–420.

On September 4, 1987, plaintiff received a formal performance evaluation of unsatisfactory. As a result, plaintiff was terminated from her employment. *Id.* at p. 435. While plaintiff's commission statement indicates plaintiff satisfied her quota, she did so only because of the efforts of the account marketing representatives of the branch. Ray dep. pp. 99–104.

Shortly after her discharge, plaintiff filed a workers' compensation claim. On April 13, 1988, less than one month before filing the instant lawsuit, plaintiff redeemed her workers' compensation claim for $80,000. The redemption agreement provides, in relevant part:

Plaintiff and Defendants herein realize that there are disputes as to legal liability and as to the medical causation in this matter. In view of the above disputes, and because of the uncertainty of litigation it is stipulated and agreed to by and between the parties hereto that *payment of the amount herein stated is intended to forever release Defendants herein from all actions,* causes of action, claims and demands for, upon, or by reason of any damage, loss, expenses, injury or disease, *known or unknown, which may be traced either directly or indirectly to Plaintiff's employment with Defendant, even though Plaintiff may not have made claim for any of these injuries or diseases as of this time.*

Plaintiff understands that this is a full and final settlement of any and all claims for injuries or diseases which he [sic] may have sustained at any time in the course of this employment with the Defendants. (Emphasis added).

### LAW

**A. PLAINTIFF RELEASED IBM FROM LIABILITY FOR ALL CLAIMS ARISING FROM HER EMPLOYMENT**

■ Defendant argues it is free from liability as a result of the clear and unambiguous language of the workers' compensation redemption agreement. Plaintiff responds the redemption agreement fails to preclude plaintiff's current claims for two reasons. First, plaintiff's counsel submits he participated in the negotiations which resulted in the redemption agreement. Plaintiff's counsel asserts that during settlement negotiations, counsel for defendant agreed the workers' compensation redemption was separate and distinct from the claims alleged in this action. Second, plaintiff submits it is clear under Michigan law that the exclusive remedy provision of the Workers' Disability Compensation Act does not preclude claims for mental and physical

injury resulting from employment discrimination.

This Court is not persuaded by plaintiff's arguments.

It is well-settled that when the language of an agreement is unambiguous, the meaning of the language is a question of law. *Michigan Chandelier Co. v. Morse,* 297 Mich. 41, 297 N.W. 64 (1941). In *Morse* the court held:

> The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest. It is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument (citation omitted).

> \* \* \* \* \* \*

> We must look for the intent of the parties in the words used in the instrument. This Court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning.

297 Mich. at 49, 297 N.W. 64.

The Court finds the redemption agreement to be clear and unambiguous. If plaintiff's counsel agreed to additional terms he should have incorporated those terms into the written agreement. Regardless of plaintiff's counsel's failure to incorporate additional terms into the redemption agreement, counsel has failed to document the alleged agreement by affidavit or other method provided by Rule 56. Thus, counsel's unsupported allegation cannot preclude summary judgment.[6]

Plaintiff also argues that the exclusive remedy provisions of the Workers' Compensation Act do not preclude claims resulting from employment discrimination. *Boscaglia v. Michigan Bell Telephone Co.,* 420 Mich. 308, 362 N.W.2d 642 (1984). This Court agrees with the above cited legal proposition. However, the scope of the Workers' Compensation Act is not relevant to the issue before the Court. The issue to be resolved by this Court is whether the clear and unambiguous language of a Workers' Compensation Redemption Agreement can bar a subsequent claim for employment discrimination.

This Court finds as a matter of law that a Workers' Compensation Redemption Agreement can incorporate a release of liability for claims not precluded by the exclusive remedy provisions of the Workers' Compensation Act. The same finding has been reached by the Michigan Court of Appeals on at least two occasions.

In *Beardslee v. Michigan Claim Services, Inc.,* 103 Mich.App. 480, 302 N.W.2d 896 (1981), the plaintiff injured his knee in the course of his employment. The insurer, through its agent, possessed medical information proscribing plaintiff's return to work. Nonetheless, the insurer, through its agent, instructed plaintiff to return to work and ignore the pain. Plaintiff returned to work aggravated the knee to the extent the injury resulted in total and permanent disability. Plaintiff filed a workers' compensation claim which was eventually redeemed. The plaintiff signed a release which provided that he forever released and discharged defendants "from any and all liabilities, causes of action, damages, claims and demands of whatsoever kind or nature...." In addition, the settlement was placed on the record before the State Administrative Law Judge wherein the following discussion occurred:

---

6. Fed.R.Civ.P. 56(d) provides in relevant part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but *the adverse party's response, by affidavit or as otherwise provided in this rule,* *must set forth specific facts showing that there is a genuine issue for trial.* (Emphasis added). Plaintiff's counsel has provided no affidavit or other suitable evidence to support his allegation that the redemption agreement was not intended to preclude the instant litigation.

Defense Counsel: ... Your Honor, [plaintiff's counsel] was kind enough last time to indicate that he was waiving or releasing any personal claim he might have against ... the defendants for tortious conduct in the handling of this case, and I request that he indicate that again. Plaintiff's Counsel: Yes, I personally release [defendants] for any defamation of character which I had indicated they might be responsible for in the past.

*See Beardslee,* 103 Mich.App. at 483–84, 302 N.W.2d 896.

Approximately one year later, plaintiff filed suit against his former employer, the employer's insurer and their agents in the state circuit court alleging defendants tortiously handled plaintiff's workers' compensation claim. The trial court granted accelerated judgment finding that plaintiff had released defendants of all claims arising out of plaintiff's employment.

The issue on appeal was "whether a release signed in conjunction with a Workers' Compensation Redemption Agreement can be effective to bar a subsequent non-compensation-related cause of action brought by a claimant who signed the release." *Id.* at 485, 302 N.W.2d 896. The *Beardslee* court found that:

> [w]hen the identity of the alleged tortfeasors and those who would be liable under a workers' compensation claim are identical or substantially the same, or even arguably interrelated, we can see no reason why all liability cannot be settled in one transaction.

*Id.* at 488, 302 N.W.2d 896. The *Beardslee* court found that the negligent acts upon which plaintiff sought recovery were expressly waived in both the redemption proceeding and the release signed by plaintiff. Thus, the summary dismissal was affirmed.

In *Nunley v. Practical Home Builders,* 173 Mich.App. 675, 434 N.W.2d 205 (1988), the plaintiff filed a workers' compensation claim arising out of a work related injury. Plaintiff redeemed the claim and signed a redemption agreement which provided, in relevant part, that:

> ... in consideration of a settlement of the claim through redemption proceedings with the Workmen's Compensation Department, [plaintiff] does hereby voluntarily quit his/her employment with [defendants], waives any and all seniority rights he/she may have and releases any claim he/she may have for re-employment based on such seniority rights.

Subsequent to redeeming the workers' compensation claim, plaintiff filed suit alleging a claim of race discrimination in violation of the Michigan Elliott–Larsen Civil Rights Act. The trial court granted summary judgment finding that plaintiff's suit was barred by the release he signed in redeeming his workers' compensation claim.

The appellate court affirmed. While the release signed by Nunley was not as broad as the release in *Beardslee,* the *Nunley* court expressly found that the language incorporated in the release was broad enough to bar Nunley's claims.

A similar ruling was rendered out of this district in *Hill v. Terminix Intern, Inc.,* 617 F.Supp. 1030 (E.D.Mich.1985) (Feikens, J.). In *Hill,* plaintiff redeemed a workers' compensation claim and in so doing, signed a Release and Waiver of Seniority. The release provided that plaintiff "voluntarily quit ... and waive[d] any and all seniority rights." *Hill* at 1032. Thereafter, plaintiff filed a law suit alleging wrongful termination. Judge Feikens found the language of the release broad enough to encompass plaintiff's employment termination claims. *Id.*

In addition, this Court notes the general rule of Michigan law that the construction of redemption agreements is governed by the same rules as other settlement agreements. *Beardslee,* 103 Mich.App. at 485, 302 N.W.2d 896 citing *Miller v. City Ice & Fuel Co.,* 279 Mich. 592, 277 N.W. 196 (1937). Furthermore, when the language to an agreement is unambiguous, the meaning of the language is a question of law.

Applying all of the above cited legal principles to the instant case, this Court finds that plaintiff released defendant from liability arising out of the claims asserted in

this lawsuit.[7] The release signed by plaintiff unambiguously provides:

> that payment of the amount herein stated is intended to forever release Defendants herein from all actions ... known or unknown, which may be traced directly or indirectly to Plaintiff's employment with Defendant....

In arriving at this determination, the Court notes that plaintiff's current counsel also represented plaintiff in the redemption of the workers' compensation claim. The Court also notes that the redemption agreement is not a form agreement consisting of boilerplate terms. Rather, the exact language of the agreement was negotiated between counsel. The unambiguous language of the agreement must prevail.

## B. PLAINTIFF CANNOT ESTABLISH RACE DISCRIMINATION

Plaintiff would fare no better even if her claims were not released by the redemption agreement. Plaintiff alleges a claim of disparate treatment race discrimination in violation of the Michigan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* Claims of disparate treatment race discrimination feature a shifting burden of proof. First, a plaintiff must prove a prima facie case of race discrimination. The burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employees rejection. If defendant satisfies this requirement it is then incumbent upon the plaintiff to show that the non-discriminatory reason articulated by defendant is but a mere pretext to discrimination. *Jenkins v. Southeastern Michigan Chapter, Am. Red Cross*, 141 Mich. App. 785, 369 N.W.2d 223 (1985).

For plaintiff to make a prima facie showing of race discrimination she must prove:

1. she is a member of a protected class; and
2. for the same or similar conduct she was treated differently than a member of a nonprotected class.

See, *Schipani v. Ford Motor Co.*, 102 Mich.App. 606, 617, 302 N.W.2d 307 (1981).

Under the Elliott–Larsen Civil Rights Act, summary judgment is appropriate where plaintiff cannot factually establish a prima facie case, or where plaintiff cannot establish a genuine issue of material fact as to whether the non-discriminatory reasons articulated by defendant are but a pretext to unlawful discrimination. *Clark v. Uniroyal*, 119 Mich.App. 820, 825, 327 N.W.2d 372 (1982).

■ Applying the above cited principles to this case the Court finds that plaintiff has failed to prove that she was treated differently because of her race. Plaintiff has stated during her deposition that she does not know if any account representatives were treated differently, nor does plaintiff have any personal knowledge of the goals and performance plans imposed upon similarly situated white employees. Merriweather dep. pp. 99–100, 276. Furthermore, plaintiff has testified she does not believe she was treated differently because of her race.[8]

■ Plaintiff disingenuously argues that plaintiff has established a prima facie case of discrimination because she was discharged despite the fact she was qualified. Plaintiff suggests she must be presumed qualified because she had successfully com-

---

**7.** On March 9, 1989, this Court denied plaintiff leave to amend the complaint to assert a claim of wrongful termination. On April 6, 1989, the Court denied reconsideration of the denial to amend. The Court denied leave to amend both initially and upon reconsideration for several reasons including undue delay on the part of plaintiff in bringing the amendment, undue prejudice to defendant and dilatory motive on the part of plaintiff. Given the Court's finding that plaintiff released defendant from all liability arising out of plaintiff's employment, the Court notes that any amendment to the complaint would have been futile since the wrongful

termination claim is also waived by plaintiff's release.

**8.** Plaintiff has testified that she *may* have been discriminated against in the time period of 1981 to 1984. Merriweather dep. p. 300. The limitations period for discrimination claims brought under the Michigan Elliott–Larsen Civil Rights Act is three years. *Thomas v. MESC*, 154 Mich. App. 736, 398 N.W.2d 514 (1986). The instant complaint was filed on May 10, 1988. Thus, any claim of discrimination which occurred prior to May 10, 1985 is time barred.

pleted the training program and she had attained her quota on the date of her termination.

The undisputed facts indicate plaintiff was not qualified. While plaintiff completed her training program she simply was unable to apply the knowledge she received. Plaintiff does not dispute her inability to forecast potential sales, nor that she was not involved in a significant sale during her employment at the Renaissance Branch office. Likewise, plaintiff cannot rebut the fact that other employees complained about her performance, and that her performance evaluations were below par. Plaintiff reached her quota due to overall branch sales. There is no question that plaintiff was unable to contribute to the branch sales effort.

Given the undisputed evidence, the Court finds no genuine issue of material fact and that defendant is entitled to judgment as a matter of law.

## C. PLAINTIFF CANNOT ESTABLISH A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Plaintiff also asserts a claim for intentional infliction of emotional distress. It is unclear whether the tort of intentional infliction of emotional distress may be maintained under Michigan law. *See Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 597, 374 N.W.2d 905 (1985) (Held: "We are constrained from reaching the issue of whether [the tort of intentional infliction of emotional distress] should be formally adopted into our jurisprudence ...."). Nonetheless, some Michigan courts have recognized the cause of action. *See Khalifa v. Henry Ford Hospital*, 156 Mich.App. 485, 401 N.W.2d 884 (1986); *Dickerson v. Nichols*, 161 Mich.App. 103, 409 N.W.2d 741 (1987). Likewise, the Sixth Circuit has also recognized the tort under Michigan law. *Pratt v. Brown*, 855 F.2d 1225 (6th Cir.1988). Courts which have recognized the tort have held liability only where the defendant's conduct is extreme and outrageous:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Roberts*, 422 Mich. at 597, 374 N.W.2d 905 citing Restatement Torts, 2d § 46 comment d, pp. 72–73.

Plaintiff alleges that defendant knew she was susceptible to emotional distress if she was not placed in a "non-threatening environment." Plaintiff submits she was given inadequate training and then placed in a position with inadequate guidance. Thereafter she was unjustly placed on an improvement plan which defendant knew plaintiff could not meet.

The Court first notes the lack of factual support for plaintiff's claims. Nonetheless, assuming all of the above to be true, defendant's conduct amounts to mere negligence and does not constitute conduct which is outrageous in character, extreme in degree and goes beyond all bounds of decency such that it may be regarded as atrocious. Accordingly, the Court finds plaintiff's claim of intentional infliction of emotional distress to be without merit.

## D. PLAINTIFF CANNOT ESTABLISH A BREACH OF CONTRACT ARISING OUT OF THE FAILURE TO PAY COMMISSIONS

■ Plaintiff claims to be entitled to commissions arising out of three specific sales: (1) products sold to Davidson–Gotschall in 1982; (2) products sold to F. Joseph Lamb in 1983; and (3) products received by Barton–Malow in 1983.

The undisputed facts indicate that IBM paid commission upon the installation and not the sale of equipment. Plaintiff did not receive commissions on the Davidson–Gotschall sale and F. Joseph Lamb sale

because she was reassigned out of that sales territory before product installation. Plaintiff testified she had received commissions for equipment installed in her newly assigned territory despite the fact that plaintiff did not make the sale.

As for the equipment used by Barton–Malow, plaintiff was informed that the equipment was purchased and owned by General Motors. Since General Motors was not in plaintiff's territory, she was not entitled to a commission.

Based upon the undisputed facts, the Court cannot find a breach of contract arising out of the nonpayment of commissions allegedly due.[9]

## CONCLUSION

For all the reasons stated in this Opinion the Court GRANTS defendant's motion for summary judgment.

IT IS SO ORDERED.

## JUDGMENT

IT IS ORDERED AND ADJUDGED that this action is hereby DISMISSED pursuant to the Memorandum Opinion and Order dated May 10, 1989.

**9.** The Court notes that plaintiff's brief in response to defendant's motion for summary judgment does not even address defendant's arguments regarding Count Three, breach of contract arising out of sales commissions alleged to be due and owing. Thus, the motion is unopposed as to Count Three.