**VIRTUAL MAINTENANCE, INC., a Michigan corporation, Plaintiff,**

v.

**PRIME COMPUTER, INC., a foreign corporation, Defendant.**

**No. 89–CV–71762–DT.**

United States District Court, E.D. Michigan, S.D.

April 20, 1990.

**232**

Moll, Desenberg & Bayer by Rodger D. Young, Jamal John Hamood, Southfield, Mich., for plaintiff.

Honigman, Miller, Schwartz and Cohn by Stephen F. Wasinger, Howard B. Iwrey, Detroit, Mich., for defendant.

## OPINION

GILMORE, District Judge.

This action is before the Court on Defendant's motion for summary judgment and Plaintiff's motion to amend complaint. Plaintiff, a company that provides hardware maintenance to computer users, sued Defendant, a company that supplies computer systems, distributes software and provides hardware maintenance. The complaint alleged an illegal tying arrangement between software upgrades and hardware maintenance in violation of the Sherman and Clayton Acts.

Part of Defendant's business is to supply companies with computer systems, called Computer Aided Design/Computer Aided Manufacturing Systems (hereinafter CAD/CAM), used in product design. Defendant also distributes design software for the CAD/CAM systems. Defendant has an exclusive distributorship agreement with Ford Motor Co. under which Defendant distributes a software program called PDGS. A general version of this program is widely available on the market. However, Ford has modified the program to include additional design capabilities. Defendant is the sole distributor of the modified software. Ford requires all companies that provide it with design services to use the most current version of PDGS. Defendant also provides maintenance service for both software systems and hardware systems. Defendant offers a "Software Service Program" to Ford design suppliers. Subscribers receive the Ford PDGS software and all updates and revisions as part of a package that includes hardware maintenance. In order for customers to subscribe to the software service program, they must agree to allow Prime to perform hardware maintenance on their CAD/CAM systems. Customers pay $16,000 yearly for the software service program for each installation.

Customers who do not agree to have Defendant perform their hardware maintenance cannot subscribe to the software service program. Without a subscription to the software service program, customers must purchase a new software license, marketed solely by Defendant, every time Ford upgrades or modifies the Ford PDGS. The resulting cost to the customer is $80,000–$160,000 per year for each installation. Many customers have 20 or more installations.

I

Defendant brings the instant motion for summary judgment. It alleges that Plaintiff cannot prove illegal tying, pursuant to its burden under *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("the burden on the moving party may be discharged by 'showing' that is—pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case"); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Defendant points to several failures of proof in Plaintiff's case. He alleges that Plaintiff has failed to establish the relevant market, that Defendant lacks sufficient market power, that there is no adverse effect on competition in the tied product market, that there are not two distinct products, that there is no allegation of conspiracy, that the tied product is a service, and, finally, that Plaintiff has failed to state a claim for interference with advantageous relations. Defendant's claims are sufficient to pass the burden to Plaintiff, who must now go beyond the pleadings and "designate 'specific facts showing that there is a genuine issue for trial'" in order to survive the instant motion. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

II

■ Plaintiff alleges that Defendant's linking of software upgrades and modifications to hardware maintenance is an illegal tying arrangement, with Ford PDGS as the tying product and hardware maintenance as the tied product. Plaintiff alleges that this arrangement violates the Sherman and Clayton Acts and has interfered with Plaintiff's Advantageous Relations. A tying arrangement, like that alleged by Plaintiff, is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Ry. Co., v. U.S.*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). A tying agreement can violate Section 1 of the Sherman Act, 15 U.S.C. 1, and/or Section 3 of the Clayton Act, 15 U.S.C. 14. However, the Clayton Act is violated only when the tying arrangement involves two distinct products; the Sherman Act can be violated if the arrangement involves either products or services. *3 P.M., Inc. v. Basic Four Corp.*, 591 F.Supp. 1350, 1355 (E.D. Mich.1984).

■ Proof that a company is packaging two items together is not sufficient to prove illegal tying. *Jefferson Parish*, 466 U.S. at 11, 104 S.Ct. at 1558. Rather, packaging of two items together becomes illegal tying when a seller has sufficient market dominance or control over the tying product that it can force buyers to purchase the tied product. *Id.* at 12, 104 S.Ct. at 1558. In those circumstances, "competition on the merits in the market for the tied item is restrained, and the Sherman Act is violated." *Id.*

■ A plaintiff can establish an antitrust violation using either a per se standard or the "rule of reason" standard. *Jefferson Parish*, 466 U.S. at 15–16, 29–31, 104 S.Ct. at 1559–60, 1567–68. Establishment of a per se antitrust violation requires the following proof:

First, there must be two separate products or services, with the purchase of one (the "tying product") conditioned upon the purchase of the other (the "tied product"). Second, the seller must possess sufficient economic power in the market for the tying product so that competition in the market for the tied product is appreciably restrained. Finally, a "not insubstantial" amount of commerce in

the market for the tied product must be affected.

*3 P.M., Inc., v. Basic Four Corp.,* 591 F.Supp. at 1356.

A "rule of reason" violation requires the following proof:

> Under this theory, a plaintiff is required to establish the facts peculiar to the business involved, its condition before and after the alleged restraint was applied, the nature and history of the alleged restraint, the reason for adopting the alleged restraint, and its actual or probable effect. *Chicago Board of Trade v. U.S.,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

*3 P.M.,* 591 F.Supp. at 1361, n. 16. *Fortner Enterprises v. U.S. Steel,* 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969).

In this motion, the parties' arguments have focused on proof under the per se standard. The court's analysis will focus there as well. Among the many disputed issues, that most contested by the parties is the second prong of the per se test, whether Defendant has sufficient economic power in the market for the tying product to appreciably restrain competition. As the Supreme Court has made clear, in order to determine market power, it is essential to first define the relevant market, for "without a definition of [the relevant market] there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process Equipment, Inc. v. Food Machinery Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). Identifying the relevant product and geographic market is particularly significant in a tying case because the illegality of the challenged conduct "depends upon its competitive consequences, not on whether it can be labeled 'tying.'" *Jefferson Parish,* 466 U.S. at 21, n. 34, 104 S.Ct. at 1562, n. 34. It is clear that relevant market is a material issue in this case.

The Sixth Circuit determines the relevant market by a standard of interchangeability. In *A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673 (6th Cir.1986), the court stated:

> The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendants' product or service ... This comparative analysis has been characterized as the "reasonable interchangeability" standard.

*Id.* at 675. *See White & White v. American Hospital Supply Corp.,* 723 F.2d 495, 500 (6th Cir.1983).

Though both parties adopt the standard of interchangeability to define the relevant market, there is a clear dispute between them regarding the scope of the relevant market. Both support their claim of the relevant market by affidavits, including experts' affidavits.

Defendant relies on two affidavits in support of its claim of the appropriate market. The first, from Kenneth Tarpey, Vice President of Defendant's Customer Service, Planning and Business Development, defines a broad market in which Defendant has a very small market share. Mr. Tarpey states that there is widespread interchangeability between computer systems and software, and that computer users consider several vendors' systems before making a purchase. Because of this interchangeability, Prime sells its products to competitors' customers and competitors induce Prime customers to buy their products. Prime markets a mini-computer, but full-size computers, made by IBM, UNISYS, NCR, Digital Equipment, Hewlett–Packard, Data General and others, perform the same functions as mini-computers, and compete for Prime customers. This competition is evident in the erosion of mini-computer sales made by personal computers and computer work stations. Similarly, Mr. Tarpey states that Prime must also compete with software manufacturers, a highly competitive area. Based on the fierce competition faced by Prime, and the great interchangeability of computer products, Mr. Tarpey contends that the relevant market should be defined as the market for all computers. He identifies Prime's share of that market as less than 0.6%.

Defendant next relies on the affidavit of Dr. Elisabeth M. Landes, an economic professor and consultant. She states that hardware and software maintenance are not a distinct market, but are part of the larger market for CAD/CAM computer systems, because maintenance cost and availability affect the sale of computer systems. Any price increase for software modifications, revisions and updates or hardware maintenance will increase the total price of a CAD/CAM system, causing the vendor to lose business. Hardware maintenance can be offered either by the seller of the system or by third parties. However, the cost for hardware maintenance will affect demand for the system. It is in a vendor's interest to see that hardware maintenance at advantageous terms is available to its customers, whether through the vendor or through third parties. The linkages between a computer system and its software are such that they are not separate products. Prof. Landes concludes that the appropriate market in which to evaluate Prime's market power includes the computer systems software offered by all CAD/CAM vendors or by all CAD/CAM vendors offering mechanical CAD/CAM systems. In either market, Prime has such a small share that it does not have market power.

Plaintiff offers the affidavit of Jeffrey K. Mackie–Mason, a Professor of Economics at the University of Michigan, in support of its claim of market power. Prof. Mackie–Mason describes two particularly important markets for this case. The first, which he claims is the broadest possible correctly defined market, is "software programs used for computer-aided design and computer-aided manufacturing applications" (CAD/CAM). The second is a significantly more narrow market, defined as "software programs required by Ford Motor Co. for CAD/CAM applications." Prof. Mackie–Mason argues that Prime has sufficient market power over an appreciable number of customers within each of these markets to force a burdensome tie-in or price increase on its customers. He defines market power pursuant to the Department of Justice Merger Guidelines, which describe the relevant market for antitrust analysis as "a group of products for which, if there were only one seller, that seller could profitably raise the price by 5% for one year.... The relevant market for antitrust analysis is the smallest potential market that satisfies the above condition." He states that his market, rather than the broader market defined by Defendant, satisfies the guidelines. He specifically attacks Plaintiff's broad market definition, arguing that past price increases for PDGS software demonstrate that Prime has the power to raise prices 5% and more, thus satisfying the definition for relevant market.

Market definition is key to evaluating Plaintiff's antitrust claim under the per se standard. The determination of relevant market is a question of fact. *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 499–500 (6th Cir.1983) (finding of fact subject to the "clearly erroneous" standard). *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979 (6th Cir.1977); *Telex v. IBM Corp.*, 510 F.2d 894, 915 (10th Cir.) *cert. dismissed* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

█ There is substantial evidence produced by both sides in support of their version of market power. The expert opinions directly clash. It would be improper, under these circumstances, for this court to make a determination of the relevant market without hearing cross-examination of the experts and viewing the expert testimony in the more complete factual context of trial. As *Celotex, supra*, makes clear, summary judgment is improper when there is a genuine issue of material fact. *Id.* 477 U.S. at 322, 106 S.Ct. at 2552. Moreover, there is direct expert clash on other issues of fact, material under the *3 P.M.* test, including whether the products are separate and whether PDGS is unique. The court will not evaluate these in detail because the factual question regarding relevant market share is itself sufficient to preclude summary judgment.

This determination does not conflict with recent Sixth Circuit cases affirming grants of summary judgment to antitrust defen-

dants. In *International Logistics Group v. Chrysler Corp.*, 884 F.2d 904 (6th Cir. 1989), the court determined that Plaintiff had failed to satisfy its burden of proof in defining and proving the relevant market. The court stated that market power must be "proved," not "assumed." *Id.* at 908. The court reasoned that the Plaintiff had to prove, using the rule of interchangeability, that there were no reasonable substitutes available, but had failed to do so. *Id.* In the instant suit, Plaintiff has claimed that PDGS is unique because it is modified by Ford, that only Prime sells this modified version, and that Ford requires use of this version by its design suppliers. These claims are supported by expert affidavit. Plaintiff has provided enough evidence of no reasonable substitutes to survive summary judgment.

In *A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d at 677, the court found dispositive the fact that Plaintiff could not prove that the product was unique and that the market was consequently narrowly defined. This court distinguishes *A.I. Root* by determining that Plaintiff has provided sufficient evidence that PDGS is unique to support its narrow market definition on a motion for summary judgment. The claim of uniqueness is disputed by Defendant's expert, but resolution of that dispute is properly reserved for trial. *See General Business Systems, Inc. v. North American Phillips Corp.*, 699 F.2d 965, 973 (9th Cir.1983) (plaintiff failed to present substantial evidence of its market definition); *3 PM v. Basic Four Corp.*, 591 F.Supp. 1350 (E.D.Mich.1984) (failure to present evidence that Defendant had economic power in the relevant market made summary judgment appropriate).

Summary judgment, though disfavored in a complex antitrust case, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), can be granted when Plaintiff has failed to demonstrate any legal theory under the asserted version of the facts which can support an illegal tie. *A.I. Root v. Computer/Dynamics, Inc.*, 806 F.2d at 675. However, in the instant matter, Plaintiff has alleged facts, which if true, could potentially support a verdict. Moreover, Plaintiff has designated, by expert affidavit, several genuine issues of material fact, most notably the relevant product market, that make summary judgment in this matter inappropriate. The court denies Defendant's motion for summary judgment.

### III

Heard with this motion was a motion by Plaintiff to amend its complaint. The proposed amended complaint adds no new claims, but clarifies Plaintiff's market definition. Though the requested amendment comes late in the course of this action, Defendant has stipulated to the amendment. Fed.R.Civ.P. 15(a) provides that leave to appeal "shall be freely given." Consequently, Plaintiff's motion for leave to amend is granted.